# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-2043

JASON ROZSKOWIAK,

*Plaintiff-Appellant,*

v.

VILLAGE OF ARLINGTON HEIGHTS, an
Illinois municipal corporation, RODNEY
KATH, in his individual capacity and in
his capacity as Chief of Police of the
Village of Arlington Heights Police
Department, PETER D. KINSEY, in his
individual capacity and in his capacity as
Supervisor for the Village of Arlington
Heights Police Department, et al.,

*Defendants-Appellees.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 01 C 5414—**Robert W. Gettleman**, *Judge.*

———————

ARGUED MAY 2, 2005—DECIDED JULY 8, 2005

———————

Before BAUER, EASTERBROOK, and EVANS, *Circuit Judges.*

BAUER, *Circuit Judge.* Plaintiff-Appellant Jason
Rozskowiak sued the defendants, claiming that he was
discriminated against because of his national origin in vio-

lation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and 42 U.S.C. § 1981. The district court granted summary judgment in favor of the defendants. We affirm.

## I. Background

Arlington Heights hired Rozskowiak as a probationary police officer on October 8, 1998. Upon graduating from the Illinois Police Basic Recruits School, he was placed in a field training program. After completing the program in April 1999, he began solo patrol. On May 15, 1999, while on solo patrol, Rozskowiak arrested Harvey Olson for driving without a license on his person and speeding. Olson filed a citizen complaint, alleging that Rozskowiak used excessive force and "Gestapo-like tactics" against him and his wife during the encounter.

Deputy Chief of Police Ronald McClaskey assigned Sergeants William Martin and Kenneth Galinski to investigate the Olson complaint, and they reported their findings. At his deposition, Sergeant Martin testified that he concluded that Rozskowiak "overreacted to a traffic stop in which he was confused about a charge of driving without a driver's license [on the person] and the charge of driving without a valid driver's license." According to Sergeant Martin, Rozskowiak had handcuffed Olson and brought him into the police station.

In light of the Olson complaint and subsequent internal investigation, Chief of Police Rodney Kath asked his Command Staff whether he should recommend Rozskowiak's dismissal or invest more time in his training. Chief Kath's Command Staff is comprised of four commanders, two captains, and the deputy chief of police. Based on the group's recommendation, Chief Kath ordered Rozskowiak to undergo further training under the supervision of Sergeant William Newman. Between June 17, 1999,

and July 12, 1999, Sergeant Newman spent thirteen days, totaling between 90 and 100 work hours, directly observing Rozskowiak. Sergeant Newman reported on his observations daily, and Rozskowiak confirmed the accuracy of each report with his signature. Sergeant Newman was not asked to nor did he make recommendations about terminating Rozskowiak.

Rozskowiak testified that, during the thirteen-day ride-along period, Sergeant Newman called him a "stupid Polack" and made other derogatory comments about his Polish ancestry. Sergeant Newman, however, denied this characterization of his remarks. At his deposition, Sergeant Newman testified:

> Well, [Rozskowiak] would make a specific comment, he would say—he would raise his hands and put a smile on his face and he'd say, "What do you expect? I'm Polish," when confronted with a problem or some type of criticism, and he would do that several times a day. . . . And after several days of observing that, when he would start to put his hands up on several occasions, as he would start to say that, I would say, "Yes, I know you're Polish. Let's move on," and I would move on in our conversation.

Sergeant Galinski also testified that Rozskowiak responded to criticism by asking, "Come on, what do you expect from a Polack?" Sergeant Raymond Rohde stated the same in his affidavit. Rozskowiak, however, denies making derogatory remarks about himself as an excuse for his performance.

Rozskowiak also testified that Commander Peter Kinsey made derogatory remarks. During the ride-along period, Commander Kinsey told him that he was not cut out to be a police officer in Arlington Heights because he was Polish.

After the ride-along period ended, Sergeant Newman submitted his final report to Deputy Chief McClaskey on July 28, 1999. Rozskowiak stated in his affidavit that, after

the ride-along assignment was completed, Sergeant Newman continued to tell him that he was going to be fired because he was a "stupid Polack." At his deposition, however, he testified that Sergeant Newman made no further derogatory remarks after the ride-along assignment had ended.

Chief Kath testified that after Sergeant Newman filed his report, the Command Staff reviewed the report's findings and determined that Rozskowiak had not met the standards required for service in Arlington Heights. This decision, he stated, was based on not only Sergeant Newman's report, but also the report from the Olson incident and at least one other citizen complaint. Deputy Chief McClaskey and Commander Kinsey met with Rozskowiak on or about August 10, 1999, to inform him that Chief Kath would recommend his termination to the Board of Fire and Police Commissioners (the "Board"). According to Deputy Chief McClaskey, this meeting was the first time that he learned of the derogatory remarks that were made to Rozskowiak. There is no evidence that Chief Kath knew about those statements prior to drafting his recommendation to the Board.

On August 19, 1999, Rozskowiak met with the Director of Human Resources and the Assistant Village Attorney for Arlington Heights to discuss his claims. They investigated and concluded that Chief Kath's decision to recommend Rozskowiak's termination was made for legitimate, non-discriminatory reasons. The Board terminated Rozskowiak on August 30, 1999.

Rozskowiak filed a complaint against the defendants, alleging that he was exposed to a hostile work environment and discriminated against on the basis of national origin. The complaint also alleged violations of the Labor Management Relations Act and various state laws. After discovery, the defendants moved for summary judgement. The district

court granted summary judgment in favor of the defendants on March 24, 2004. Rozskowiak limits his appeal to the national origin discrimination claim.

## II. Discussion

We review the district court's grant of a motion for summary judgment *de novo. Sartor v. Spherion Corp.*, 388 F.3d 275, 277 (7th Cir. 2004). Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). If the moving party meets this burden, the nonmoving party must then go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e); *Becker v. Tenenbaum-Hill Assoc., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990). The existence of merely a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

A plaintiff bringing a claim under Title VII can prove discrimination using either the direct method or the indirect method that the Supreme Court set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060-61. Rozskowiak proceeds under both methods.

## A. Direct Method of Proof

Rozskowiak claims that the district court erred in finding that the derogatory remarks made by Sergeant Newman

and Commander Kinsey were unrelated to the decision to fire him. A plaintiff can use direct or circumstantial evidence to show that his employer's decision to terminate him was motivated by his national origin. *See Cerutti*, 349 F.3d at 1061. "Direct evidence 'essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus.'" *Id.* (quoting *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003)). Derogatory statements made by someone who is not involved in making the employment decision at issue are not evidence that the decision was discriminatory. *Gorence v. Eagle Food Centers, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001). However, if the person who made the derogatory remarks provided input into the employment decision—and the remarks were made around the time of and in reference to that decision— "it *may* be possible to infer that the decision makers were influenced by those [discriminatory] feelings." *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 652-53 (7th Cir. 2000) (emphasis added); *see also Gorence*, 242 F.3d at 762. Discriminatory remarks are actionable only if they injure the plaintiff; "there must be a real link between the bigotry and an adverse employment action." *Gorence*, 242 F.3d at 762.

Even reading the facts in the light most favorable to Rozskowiak, we find that the district court was right to conclude that Sergeant Newman's remarks were unrelated to Rozskowiak's termination. Rozskowiak testified that on several occasions Sergeant Newman told him that he "would probably be losing [his] job because [he] was a stupid Polack." Rozskowiak Affidavit at ¶¶ 12-13. However, it was Chief Kath—not Sergeant Newman—who recommended his termination to the Board, and it was the Board that made the ultimate decision on the matter. Sergeant Newman's input was limited to the content of his ride-along report, which offered no recommendations. Rather, the report identified deficiencies Rozskowiak had in the areas of report writing, retention of knowledge, basic skills, and decision

making. Newman Deposition at 75. There is no evidence that the information contained in the report was inaccurate; indeed, Rozskowiak confirmed its accuracy. Therefore, the district court's determination that Sergeant Newman's remarks were unrelated to Rozskowiak's termination was appropriate.

Neither is there evidence that Commander Kinsey's derogatory remarks were related to Rozskowiak's termination. According to Rozskowiak, Commander Kinsey stated that he was not cut out to be a police officer in Arlington Heights because he was Polish. Rozskowiak Deposition at 34. Unlike Sergeant Newman, Commander Kinsey was on the Command Staff which advised Chief Kath to recommend Rozskowiak's termination. The Command Staff's recommendation reflected a consensus of its members' views. McClaskey Deposition at 23. That distinguishes this situation from the one that we saw in *Hunt v. City of Markham, Ill.*, 219 F.3d 649 (7th Cir. 2000), which involved allegations that a city council's decision to deny requests for raises was discriminatory. In *Hunt*, the district court had found that the mayor's racist and ageist statements had not influenced the city council's decision. *Hunt*, 219 F.3d at 652. We reversed, holding that although the mayor had no actual vote in the city council's matters, the fact that he stood in a position of influence and recommended that the council take the action complained of made his statements evidence of the city's discrimination. *Id.* at 653.

In the case before us, Commander Kinsey did not have the singular influence over decision makers that the mayor in *Hunt* had; rather, he was one of the Command Staff's seven members, and they advised the Chief by consensus. In fact, Commander Kinsey recalled times when his views about Rozskowiak's potential as a patrol officer were not adopted by the group as a whole. Kinsey Deposition at 98. Furthermore, there is no evidence that Chief Kath met alone with Commander Kinsey to discuss matters per-

taining to Rozskowiak. Indeed, both Chief Kath and Deputy Chief McClaskey testified that they were unaware of the derogatory remarks that were directed at Rozskowiak until after the Board recommendation was drafted. Kath Affidavit at ¶ 12 ; McClaskey Affidavit at ¶ 11.

In addition, there is no circumstantial evidence that the decision to terminate Rozskowiak was based on anything but a legitimate, non-discriminatory analysis of Sergeant Newman's report and several citizen complaints. Although Rozskowiak argues that the existence of the citizen complaints is a disputed fact that the district court erroneously decided against him, we disagree. The Olson complaint produced an investigative report that was critical of Rozskowiak's handling of the matter, and this report was the sole basis for the decision to provide him with further training. Rozskowiak notes that the two authors of the report disagreed as to whether he handled the incident correctly; Sergeant Martin was critical, but Sergeant Galinski was not. Martin Deposition at 25; Galinski Deposition at 23. Their difference of opinion, however, is not evidence that the report contained no criticism of Rozskowiak. Furthermore, Deputy Chief McClaskey described a second complaint in detail at his deposition and testified that he believed it was investigated by Sergeant Lane at a supervisory level. MacClaskey Deposition at 41-48. Rozskowiak has produced no evidence to the contrary. We agree with the district court that he has shown no direct proof of discrimination.

## B.  Indirect Method of Proof

Rozskowiak also claims that the district court erred in finding that he failed to establish a prima facie case of discrimination. Under the indirect method of proving discrimination, a plaintiff can establish a prima facie case by showing that: (1) he is a member of a protected class; (2) he

was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) other similarly-situated employees who were not members of the class were treated more favorably. *McDonnell Douglas*, 411 U.S. at 802; *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002). If a prima facie case is established, the defendant must then produce evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the defendant is able to do this, the burden shifts back to the plaintiff to demonstrate that the explanation is a pretext. *McDonnell Douglas*, 411 U.S. at 804; *Wells*, 289 F.3d at 1006.

We agree with the district court that Rozskowiak did not establish a prima facie case of discrimination, as he failed to produce any evidence that similarly-situated employees who were not of Polish descent were treated more favorably. The only evidence Rozskowiak offered is testimony by Chief Kath that no other officer was terminated solely for their inability to retain information or write a report. Kath Deposition at 29. His termination, however, was based on not only these deficiencies, but also two citizen complaints. Rozskowiak was unable to produce any statistics or other evidence that non-Polish officers who performed similar to him were retained. As the district court observed, the Arlington Heights police force employs several officers of Polish ancestry, including Sergeants Galinski and Rohde. Rozskowiak claims that, as sergeants, they are not "similarly situated" to him for purposes of the *McDonnell Douglas* analysis. However, they too were once patrol officers; Sergeant Galinski testified that he spent over eleven years on the Arlington Heights police force before being promoted to sergeant. Galinski Deposition at 4. Because Rozskowiak failed to produce evidence that he was treated differently than other officers because he was Polish, he did not establish a prima facie case of discrimination.

### III.  Conclusion

For the reasons stated above, we AFFIRM the district court's grant of summary judgment.

A true Copy:

　　　　Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*