# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 05-3098

WANDA L. ASHMAN,

*Plaintiff-Appellant,*

*v.*

RICHARD BARROWS, JANINE JENSEN, and BOARD OF
REGENTS OF THE UNIVERSITY OF WISCONSIN SYSTEM,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 04 C 829—**John C. Shabaz**, *Judge.*

———————

ARGUED JANUARY 12, 2006—DECIDED FEBRUARY 23, 2006

———————

Before FLAUM, *Chief Judge*, and BAUER and EVANS,
*Circuit Judges*.

EVANS, *Circuit Judge*. After Wanda Ashman spent 14
years as a "limited term employee" (LTE) at the University
of Wisconsin in Madison, she convinced her superiors that
her job should be made permanent and should include the
benefits which go with permanent employment. A hiring
process was put in place, apparently with the intent that
Ashman be hired as a part-time permanent employee. The
process broke down, however, because at about the same
time that a job was being created for her, Ashman took her
fight for better conditions for LTEs to the chancellor of the

university and to a local newspaper. The result was that someone else got the newly created, now-permanent job. Ashman sued under 42 U.S.C. § 1983, contending that the defendants retaliated against her for speaking out about the issue of the university's treatment of LTEs, in violation of her First Amendment rights. The defendants moved for summary judgment and the district court granted the motion. Today we resolve Ashman's appeal of that decision.

Ashman's employment with the College of Agriculture and Life Sciences (CALS) at the university began in 1986. In 1992, she began working with a computer program called the Degree Automated Reporting System (DARS). She was also responsible for maintaining the department's Web site. It was in September 2000 that Ashman talked with her supervisors—defendants Richard Barrows, the associate dean of the CALS, and Janine Jensen, the student services coordinator of the Department of Academic Student Affairs for CALS—claiming that her job was undervalued and undercompensated. She had not received a raise in her hourly wage for over 8 years, and she was an LTE for 14 years. Barrows and Jensen agreed to convert her position to a permanent part-time position. To comply with hiring procedures, they had to develop a job description and post the position for contractual transfers. Ashman gave them a copy of her resumé, a description of the essential responsibilities of her job, and a list of qualifications or skills needed in the job. She estimated that 50 percent of her time was with the degree reporting system and 50 percent with webmaster duties.

Apparently, the whole point of the recruitment process was to create a permanent position which would reflect Ashman's job duties and then to give her the job. She acknowledges that this purpose may have been a questionable practice under the state civil service rules, but, she says, we should not hold that against her. Ashman's

position was reclassified to Information Services (IS) Resources Technician and "posted" on April 18, 2001.

At about this time, the plan to give Ashman the job started to unravel. On April 3, 2001, Ashman met with Chancellor John Wiley and members of the Student and Labor Action Coalition to discuss the plight of LTEs at the university and possible legislation to eliminate the oxymoron of long-time, limited term positions and to make the positions permanent. Ashman discussed her view that the university misused LTEs in general.

The next day, Ashman told Barrows and Jensen about the meeting with Chancellor Wiley. She told them that even though her position was going to be made permanent, she wanted to help other LTEs. She also told them that it was possible that there would be an article in *Isthmus*, a local newspaper, about the topics covered in the meeting; she warned Barrows and Jensen that she was not sure whether the article would be factual or inflammatory. Also, in May, Ashman met with members of the Coalition and Wisconsin State Representative Jean Hundertmark regarding the university's use of LTEs.

On June 22, the *Isthmus* article was published. It stated, "Wanda Ashman is fed up. For nearly nine years she has been employed 'in training' as a computer code writer for the UW-Madison College of Agriculture" and that the UW was being "dishonest and irresponsible by not classifying her and others like her as permanent employees." The article pointed out that LTEs do not receive benefits such as health care, paid vacation or sick days, and retirement savings.

After the article was published, Jensen told one of Ashman's coworkers, Sue Gisler, that Barrows was "really furious and angry" about the article, a fact Gisler also observed for herself. Gisler heard Barrows complain at staff meetings that Ashman had "made the college look bad."

Another of Ashman's coworkers, Sue Brusveen, also heard Barrows say he was not happy about the story in *Isthmus*. Both Gisler and Brusveen said that Barrows treated Ashman differently after she called attention to the LTE issue. Both women concluded that Ashman did not get the position as IS Resources Technician because of her complaints.

On June 19, Barrows and Jensen cancelled recruitment for the position. The reason they gave for their action was that they were going to adopt a proposal from the Department of Information Technology (DoIT) for a data base Web site. This, they said, would require revamping the position. Ashman, however, contends that the change would make little difference in job duties because DoIT would set up the data base and the technician would have little to do but update it. Barrows and Jensen also changed the job description; the percentages of time spent on the duties of the job were changed—and in a way which did not make sense to Ashman. Ashman informed Barrows of her concerns about the new job description. Nevertheless, the revised job description was forwarded to Human Resources to be used as a basis for developing an examination for the position.

In July, Barrows sent a memo to the Human Resource office asking that both he and Jensen be removed from the hiring process for the IS Resources Technician position. There is evidence, however, that Jensen did not withdraw from the hiring process but participated in the development of the examination. The degree of her participation is disputed. Ultimately, the examination was prepared and consisted simply of an "objective inventory questionnaire," in which applicants were asked whether they possessed certain kinds of knowledge, skills, and experience. Ashman ranked 20th out of 34 persons taking the exam and was not among the top 10 candidates, who were invited to interview for the position. It is Ashman's view that the exam did not

reflect the duties of the job she had been performing for 8 years.

Nevertheless, Ashman's employment was terminated and another woman was hired who had no experience with the DARS system, which continued to be part of the job. The new hire was required to attend special training courses to learn the program.

Ashman's claim that she was retaliated against in violation of her rights under the First Amendment requires first a finding that her speech was constitutionally protected. To be protected, an employee's speech must be that of a citizen on a matter of public concern. *Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563 (1968). It is uncontested in this case that Ashman's speech—the alleged misuse of LTEs by the university—was a matter of public concern.

The next step requires that Ashman show that her speech was a "motivating factor"—i.e., that it "played a substantial part"—in her rejection and termination. *Spiegla v. Hull*, 371 F.3d 928, 941-943 (7th Cir. 2004). If she succeeds, the employer can still prevail if it can show either that its interest in efficiently providing services outweighs the employee's rights or that it would have taken the adverse employment action even in the absence of the protected speech. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977); *Gustafson v. Jones*, 290 F.3d 895 (7th Cir. 2002). The questions before us involve only whether Ashman's speech played a substantial part in the employment decision and, if so, whether the university would have taken the same actions without the speech. The fundamental issue, however, is whether, on the facts of this case, these questions can be resolved on summary judgment.

We review summary judgment decisions *de novo*. To prevail on her appeal, Ashman must convince us that there is a genuine issue of material fact as to each question.

*McGreal v. Ostrov*, 368 F.3d 657 (7th Cir. 2004). We construe all facts in the light most favorable to Ashman, the party opposing summary judgment, and we draw all reasonable inferences in her favor. *Id.* We are particularly leery of resolving issues involving a state of mind on summary judgment. *Alexander v. Wisconsin Dept. of Health & Family Servs.*, 263 F.3d 673 (7th Cir. 2001). In fact, in *McGreal*, 368 F.3d at 677, we quoted *Pfizer, Inc. v. International Rectifier Corp.*, 538 F.2d 180, 185 (8th Cir. 1976), which stated that "[s]ummary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles." *See also Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93 (7th Cir. 1985).

It seems clear that this is a case in which summary judgment is inappropriate. The record is replete with incidents which are open to interpretation. It is easy to infer that starting in the fall of 2001, Ashman's dissatisfaction with being a long-term, limited term employee bubbled to the surface. She complained to her supervisors, who at first seemed sympathetic and agreed to try to fix the situation by creating a permanent, part-time job for her. Ashman, however, also took her dissatisfaction with the LTE situation to others: notably, the chancellor and a newspaper. Much was made at argument about the timing of the events in the case and particularly the *Isthmus* article in relation to the significant employment actions. The undisputed facts show that the article appeared on June 22, 3 days after Barrows and Jensen had cancelled the recruitment for the new position—on June 19. However, we do not find the timing of these two events to be the only relevant facts. Our review of the record convinces us that before the 19th, Ashman had exercised her free speech rights to a degree which would allow a reasonable jury to conclude that her speech was a substantial factor in the defendants' actions. She had met with the chancellor and

the Student and Labor Action Coalition, and she told Barrows and Jensen about the meeting. She also told them at that time that there might be an article about the meeting in *Isthmus*. She indicated that the article might be inflammatory. She had also met with a state lawmaker on the issue.

It is also noteworthy that relevant events regarding the job occurred after the *Isthmus* article appeared. The situation continued to deteriorate. For one thing, the process of revamping the duties of the new position continued after the 22nd. In addition, it was not until July that Barrows asked that he and Jensen be taken out of the hiring process. Also, significantly, there are the observations of Ashman's coworkers that Barrows was very angry with her. We are not saying that a jury must conclude that these incidents were a substantial factor in the employment decision. What we are saying, however, is that whether they were or not is a question for a jury, not a judge on summary judgment.

It is also a jury question whether Ashman would have been eliminated from consideration even had she been less vocal about her complaints. A jury could look to the fact that Ashman performed to the defendants' satisfaction for many years. Otherwise, a reasonable jury might wonder why Barrows and Jensen would be willing to create a position for her. And after setting out to create the position, why did they change course? Are the reasons they give convincing? The record contains no indication that Ashman was incompetent and, in fact, she continues to be employed by the university. What happened in regard to Ashman's employment by CALS is not something which can be determined on the record as a matter of law. There are far too many unanswered questions about motivation and intent.

Accordingly, the judgment of the district court is REVERSED and the case is REMANDED for further proceedings.

A true Copy:

Teste:

_____
***Clerk of the United States Court of
Appeals for the Seventh Circuit***