In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-2687

GRACE PTASZNIK,

*Plaintiff-Appellant,*

*v.*

ST. JOSEPH HOSPITAL and
RESURRECTION HEALTH CARE,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 0320—**Amy J. St. Eve**, *Judge.*

ARGUED JUNE 1, 2006—DECIDED SEPTEMBER 21, 2006

Before FLAUM, *Chief Judge,* and WILLIAMS and SYKES,
*Circuit Judges.*

WILLIAMS, *Circuit Judge.* In this employment discrimination lawsuit, Grace Ptasznik, who is a Polish immigrant, was terminated from her job as a sleep technician at St. Joseph Hospital for allegedly failing to follow protocol while attending to a patient. Ptasznik sued St. Joseph and Resurrection Health Care, a network of healthcare providers that includes the hospital, claiming she was subjected to age discrimination, national origin discrimination, and a hostile work environment. Ptasznik sought federal relief pursuant to the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.,* Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and 42 U.S.C. § 1981. Ptasznik also asserted a state law claim against the defendants for defamation.

St. Joseph Hospital and Resurrection Healthcare filed a motion for summary judgment on all claims, and Ptasznik filed a partial cross-motion for summary judgment on her defamation claim. The district court granted summary judgment to the defendants on all of Ptasznik's claims, and she now appeals.[1] Because Ptasznik has failed to create a triable issue of fact as to whether her employer discriminated against or defamed her, we affirm the judgment of the district court.

## I.  BACKGROUND

The following facts are recited in the light most favorable to Ptasznik, who was the non-moving party for purposes of summary judgment: Grace Ptasznik, a fifty-one year old Polish immigrant, began working as a sleep technician at the St. Joseph Hospital sleep center in 2001. The hospital's sleep center, which is located in Chicago, Illinois, is a research facility that conducts sleep studies to determine whether patients suffer from sleep disorders. Elena Kurth was the Director of Rehabilitation Services and the manager of the Sleep Center. Dr. Joanne Kirby was responsible for clinical oversight of the St. Joseph Sleep Center, as well as reviewing and interpreting sleep studies performed by the technicians. Sara Piekielny served as Director of Human Resources throughout Ptasznik's tenure at St. Joseph.

---

[1]  Ptasznik did not address in her appellate brief whether the district court erred when it granted summary judgment on her hostile work environment claim. Therefore, we assume she has abandoned that claim on appeal.

When she started her job, Ptasznik initially reported to Elena Kurth. In May 2002, Gina Ogunseye was promoted and became Ptasznik's immediate supervisor. According to Ptasznik, Ogunseye made repeated harassing references to her national origin and age. For instance, in November 2002, Ogunseye told Ptasznik "you're old, you're Polish, and you're stupid." On another occasion, in January 2003, Ogunseye allegedly told Ptasznik that she would be better suited as a cleaning lady. Ptasznik also alleges that at other unspecified times her supervisor made disparaging comments about her age and Polish ancestry.

Ptasznik was ultimately terminated from her job, allegedly for improperly performing a sleep study. During a sleep study, a technician monitors the sleeping patient's vital statistics by attaching sensors or electrodes to the patient; these sensors are then connected to a computer that monitors the patient's heart rate and oxygen levels. Ptasznik does not dispute that she received a copy of the hospital's "Protocol for Record Documentation," which instructs sleep technicians to document the computer-generated data every 30 to 45 minutes during the study. If there are any discrepancies in the data, the hospital's protocol requires the technician to document and investigate the problem and, in some instances, notify the sleep center director or a hospital physician. If a patient's blood oxygen level registers at 89% or below, known as a "desaturation," the technician must first verify that the sensor readings are accurate and then add oxygen by applying continuous positive air pressure ("CPAP"). If blood oxygen levels do not improve, the technician must inform the director or a physician. If a study ends early, the technician is required to document the reason for terminating the study.

On January 24, 2003, Ptasznik conducted a sleep study on a patient to determine if the patient suffered from a sleep disorder. At some point during the study, the patient

experienced trouble breathing, and Ptasznik made the following entry on her "Tech Impression Sheet":

> Patient's nose blocked. She states to have nose surgery years ago. Patient says she has allergy, also. Patient can't close her mouth for longer than minute or two because she can't breathe. Mouth open when CPAP. Patient asked for stronger air and she wanted to try. She desaturated. I didn't add oxygen because she is having severe apnea and can't get mouth closed for CPAP. So I didn't enter O2 for that reason.[2]

Ptasznik also noted on her tech impression sheet that she observed the patient's oxygen level drop to 43% and to 47%, and she noted that the patient experienced "steady low desaturations." At some point during the study, Ptasznik applied a CPAP to the patient, but subsequently removed it when the patient reported being unable to breathe. After the failed attempt to administer the CPAP, Ptasznik terminated the study and stopped recording entries for the patient in her log. Over the course of the eight hour study, Ptasznik documented the patient's oxygen levels on three occasions. Ptasznik did not contact a doctor during or after the study, and she did not document a reason for ending the study early.

On February 7, 2003, Ogunseye, Kurth and Kirby met with Ptasznik to discuss the January 24 sleep study. Regarding the inconsistencies between the desaturation data and her apparent failure to respond to the computer-generated readings properly, Ptasznik stated that she did not observe oxygen levels as low as 40-50% and, therefore, did not deem it necessary to recheck the accuracy of

---

[2] Appendix to Def.'s Local Rule 56.1 (a)(3) Statement of Material Facts, Ptasznik Dep. Ex.

the sensors connected to the patient.[3] Ptasznik also stated that she did not continue to apply oxygen because of the patient's intolerance for CPAP. After the meeting, Ogunseye, Kurth, Kirby and Piekielny collectively decided to terminate Ptasznik for endangering the patient during the January 24 sleep study. Ptasznik unsuccessfully appealed her termination through the hospital's grievance process. She also sought unemployment benefits, and her supervisors testified at the benefits hearing that Ptasznik was terminated for placing the patient at a critical risk of harm. After Ptasznik's discharge, a 30-year-old Caucasian man who had worked part-time as a sleep technician was hired full-time in the sleep center; a 31-year-old African-American woman was also shifted from part-time to full-time work.

Ptasnik filed suit against St. Joseph Hospital and Resurrection Healthcare, claiming she was subjected to age and national origin discrimination, a hostile work environment, and defamation. The United States District Court for the Northern District of Illinois granted summary judgment to the defendants. This timely appeal followed.

## II. ANALYSIS

We review the district court's judgment de novo, *Ashman v. Barrows*, 438 F.3d 781, 784 (7th Cir. 2006), and conclude that Ptasznik has failed to create a material, triable issue of fact to survive summary judgment. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of

---

[3] As we will discuss below, Ptasznik's response is inconsistent, given her notes on the tech impression sheet that she observed the patient's oxygen level reach 47% and 43%.

material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party meets this burden, the nonmoving party must then go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.,* 914 F.2d 107, 110 (7th Cir. 1990). The existence of merely a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### A.  Ptasznik's Age and National Origin Discrimination Claims

Ptasznik contends that her age and national origin were impermissible motivating factors in the hospital's decision to terminate her in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.,* Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and 42 U.S.C. § 1981.[4] Ptasznik may establish her discrimination claims using either the

---

[4] Ptasznik articulated her section 1981 claim in terms of national origin discrimination. Although national origin discrimination is not expressly prohibited under section 1981, the Supreme Court has defined the term "race" in section 1981 broadly to include identifiable classes of persons subjected to intentional discrimination on the basis of their ancestry or ethnic characteristics. *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756 (7th Cir. 2006) (citing *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987)); *see Von Zuckerstein v. Argonne Nat'l Lab.*, 984 F.2d 1467, 1472 (7th Cir. 1993) (citing *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987) (section 1981 protection extended to employee of Puerto Rican descent who alleged national origin discrimination)).

direct or indirect methods of proof, *Scaife v. Cook County*, 446 F.3d 735, 739 (7th Cir. 2006); she has failed to do so under either method.

First, under the direct method, Ptasznik must put forth evidence that her employer's decision to terminate her had a discriminatory motivation. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006); *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005). She may do so under the direct method by providing direct evidence, such as an "outright admission" of discrimination, *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 432 (7th Cir. 2005), or by presenting sufficient circumstantial evidence. *See Jordan v. City of Gary*, 396 F.3d 825, 832 (7th Cir. 2005) (internal citations omitted). But such circumstantial evidence must point directly to a discriminatory reason for the termination decision. *See Cerutti v. BASF Corp.*, 349 F.3d 1055, 1063 (7th Cir. 2003) (statements regarding plaintiff's age did not form a convincing mosaic of circumstantial evidence sufficient to prevail under direct method where the prejudicial views were not clearly linked to termination decision).

Viewing the facts in her favor, we are unpersuaded that Ptasznik's evidence is sufficient to create a triable issue of discrimination under the direct method. The defendants certainly do not admit discriminating against Ptasznik. And Ogunseye's comments that Ptasznik was "too Polish" and "too old," although off-color and probably inappropriate for the workplace, nonetheless do not constitute sufficient evidence that her employer was motivated to terminate her because of her national origin or age. *Jordan,* 396 F.3d at 832. Ptasznik alleges that the discriminatory comments occurred approximately five times in the six months before her termination; however, because she cannot recall the dates and details of Ogunseye's statements, it is unclear from the record that the comments were proximate to her discharge. Also, terminated hospital employee Fred Burks

testified during his deposition that Ogunseye told him that she wanted to "hire new people" for the sleep center. However, this statement is too ambiguous to infer discriminatory intent. And, even assuming Ogunseye wanted to hire younger, non-Polish employees, such a preference alone is not sufficient circumstantial evidence under the direct method of proving discrimination. *See Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006) (evidence that a decisionmaker generally favored hiring minorities does not prove under the direct method that any particular decision he made was for discriminatory reasons).

Ptasznik also fails to survive summary judgment under the indirect method of proof set forth in the Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To establish a discrimination claim by the indirect method, Ptasznik has the initial burden of proving a prima facie case that (1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employers' legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer. *Id.; Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 614 (7th Cir. 2005).

If Ptasznik's evidence is sufficient for a jury to find a prima facie case of unlawful discrimination, then the burden shifts to the defendants to rebut the prima facie case by articulating a legitimate, nondiscriminatory reason for terminating her. *McDonnell Douglas*, 411 U.S. at 802. Even if Ptasznik establishes conclusively that the decision to fire her was motivated in part by discrimination, the defendants may avoid liability by demonstrating that they would have made the same decision despite the alleged unlawful motive. *Gleason v. Mesirow Fin. Inc.*, 118 F.3d 1134, 1140 (7th Cir. 1997) (citing *Geier v. Medtronic, Inc.*, 99 F.3d 238, 241 (7th Cir. 1996)).

Once the defendants articulate a legitimate reason for termination, the burden then shifts back to Ptasznik to prove that the stated reason for her termination is pretextual. *McDonnell Douglas*, 411 U.S. at 804. "A pretext . . . is a deliberate falsehood." *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006); *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000) ("[P]retext means a dishonest explanation, a lie rather than an oddity or an error."). "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered." *Stewart v. Henderson,* 207 F.3d 374, 378 (7th Cir. 2000). Pretext is not necessarily established merely when the plaintiff demonstrates the employer's reason was mistaken. An employer's mistaken belief that the plaintiff's conduct merited termination is not unlawful, so long as the belief was honestly held. *See Wade v. Lerner N.Y., Inc.*, 243 F.3d 319, 323 (7th Cir. 2001) (plaintiff's age discrimination claim failed where her employer mistakenly, but honestly, believed the plaintiff had been late for work).

We have on several occasions upheld summary judgment where the plaintiff failed to show his or her employer's reasons for the adverse action were pretextual. For example, in *Ballance v. City of Springfield*, despite evidence that a similarly situated black police officer had been treated more favorably, we held that a white officer's discrimination suit could not survive summary judgment because the police chief honestly believed the officer's disciplinary problems warranted his termination. 424 F.3d 614, 621 (7th Cir. 2005). Similarly, in *Alexander v. Wisconsin Dep't of Health & Family Services*, 263 F.3d 673, 687 (7th Cir. 2001), where an African-American plaintiff claimed that his race motivated his termination, we concluded evidence that fellow employees had made numerous racially hostile comments did not rebut the employer's evidence that the plaintiff was terminated for insubordina-

tion and threatening coworkers. And, more analogously, in *Rozskowiak v. Village of Arlington Heights*, 415 F.3d 608, 611 (7th Cir. 2005), the plaintiff's supervisor told him he "would probably be losing [his] job because [he] was a stupid Polack" and made other derogatory comments about his Polish ancestry. We affirmed summary judgment to the defendants, reasoning that the derogatory remarks were unrelated to the plaintiff's termination, and the plaintiff was terminated for legitimate, job-related reasons. *Id.* at 612.

Even assuming that the record creates an initial inference of national origin and age discrimination, the defendants rebutted Ptasznik's prima facie case by articulating a legitimate reason for terminating her. Namely, the hospital concluded that Ptasznik failed to document her results of the sleep study every 30-45 minutes, endangered a patient when she failed to contact appropriate medical personnel, and failed to document the reason for terminating the study. Ptasznik has failed to show St. Joseph's legitimate, non-discriminatory reasons for firing her were pretextual. To attempt to show pretext, Ptasznik maintains that hospital staff members, including Ogunseye, were aware that a computer glitch had generated inaccurate patient oxygen levels before the January 24 sleep study. Further, Ptasznik contends that she was unaware of the inaccurate computer data until after the study ended. However, in her technician impression log, Ptasznik manually recorded that the patient's oxygen levels dropped to 47% and 43% and that the patient experienced "steady low desaturation." Even if we agreed with Ptasznik that she should not have been discharged for a computer glitch that was known to the hospital, the hospital has proffered other legitimate reasons for her termination that she has failed to rebut. Ptasznik has failed to explain why she did not document the reason for the early termination of the sleep study. Further, when Ptasznik was asked during her deposition why she

failed to record the patient's vitals every 30-45 minutes as protocol required, she responded: "I was busy with other things, and it was not absolutely necessary to put more."[5] Thus, given Ptasznik's admitted failure to follow hospital protocol in at least two other respects, summary judgment on her discrimination claims was proper.

By so finding, we are not condoning the alleged actions of Ptasznik's employer. Arguably, the hospital overreacted and unnecessarily fired an employee with an otherwise competent performance record. Nevertheless, it is not our role to determine the competency of or interfere in employment decisions simply where we believe an employer has made a poor choice. Federal courts have authority to correct an adverse employment action only where the employer's decision is unlawful, and not merely when the adverse action is unwise or even unfair. "We do not sit as a super-personnel department with authority to review an employer's business decision as to whether someone should be fired or disciplined because of a work-rule violation." *Ballance,* 424 F.3d at 621. Therefore, our inquiry is limited to whether there is a material factual dispute as to whether the employer honestly believed the stated, legitimate reasons for the adverse action. Unfortunately for Ptasznik, her evidence is insufficient for a jury to reasonably conclude that an impermissible factor such as her age or national origin motivated the hospital's decision to terminate her. Because she has failed to discredit the defendants' legitimate, non-discriminatory reasons for firing her, the district court did not err when it granted summary judgment for St. Joseph Hospital and Resurrection Healthcare.

---

[5] Appendix to Pl.'s Response to Def.'s Rule 56.1(a)(3) Statement of Material Facts, Ptasznik Dep., p. 173.

*B.  Ptasznik's Defamation Claim*

Ptasznik also asserted a claim under Illinois law against the defendants for defamation. Ptasznik maintains that the defendants knowingly and falsely accused her of putting the patient's safety at risk during the sleep study, depriving the patient of 50% oxygen, and directly endangering the patient. Ptasznik contends the defendants published these defamatory statements in emails and documents created during its internal investigation of her conduct, as well as during an unemployment benefits hearing after her discharge. Ogunseye and Kurth later testified in their depositions that they lacked the expertise to make such conclusions. The district court granted summary judgment to the defendants, and we affirm.

"To prove defamation, a plaintiff must show that the defendant made a false statement about the plaintiff, there was an unprivileged publication to a third party by the defendant, and the publication damaged the plaintiff." *Popko v. Cont'l Cas. Co.,* 823 N.E.2d 184, 188 (Ill. App. Ct. 2005). Illinois law recognizes a per se cause of action for defamation when the defamatory statements are so serious that reputational injury may be presumed. Defamation per se claims include falsely imputing an inability to perform or want of integrity in the duties of office, employment, or profession. *Van Horne v. Muller*, 705 N.E.2d 898, 903 (Ill. 1998). However, vague, unprovable statements and statements of opinion do not give rise to a defamation claim; instead, Illinois law requires that the allegedly defamatory statement contain an objectively verifiable factual assertion. *Wynne v. Loyola Univ. of Chicago*, 741 N.E.2d 669, 676 (Ill. App. Ct. 2000).

Here, Ptasznik claims the defendants defamed her in various emails and documents that were circulated among hospital personnel during the investigation of the January 24 sleep study. For example, in an email to Human Re-

sources Director Piekielny, Kurth wrote that Ptasznik "put us at significant risk: the patient could have gone into arrhythmia and coded." Also, in a timeline Ogunseye and Kurth created entitled "Grace termination events", the pair stated that Ptasznik's conduct placed the patient at significant risk.[6] According to Ptasznik, the truth of these statements is readily verifiable, and Kurth and Ogunseye knew them to be false. Although as a theoretical matter, the truth of Kurth and Ogunseye's statements may well be verifiable, we nonetheless conclude that summary judgment was proper because Ptasznik has failed to produce evidence suggesting that the statements were false. Ptasznik's own observations, as recorded on the technician impression sheet, indicate that the patient experienced "steady low desaturation" at "43%" and "47%," which would have placed the patient at risk. Even if the readings were inaccurate because of a computer glitch, Ptasznik presents no evidence that she was aware of the degree of imprecision. Unless she knew that the degree of imprecision safely placed the patient above the 89% (desaturation) threshold, the evidence only supports a finding that Ptasznik should have taken action. Thus, Ptasznik's supervisor's statements were consistent with her own records of the study, and, without evidence to the contrary, a jury could not reasonably conclude that the statements were intentionally or recklessly false.[7]

---

[6] Notably, under Illinois law, statements are sufficiently published for defamation purposes when they are recited in an interoffice document, such as an investigative memorandum regarding whether an employee should be fired. *See Popko*, 823 N.E.2d at 188; *see also Gibson v. Philip Morris, Inc.*, 685 N.E.2d 638, 645 (Ill. App. Ct. 1997) (defamatory statements regarding plaintiff's termination were published when they were included in a corporate memo to the company's human resources department).

[7] The defendants also contended the statements were protected by a qualified privilege that they did not abuse. *See, e.g.*, *Popko*,

(continued...)

Ptasznik also argues that the defendants defamed her when Kurth, Ogunseye, and Piekielny testified at her unemployment benefits hearing that she "directly endangered a patient" which resulted in a "critical risk of harm" to the patient during a sleep study. This argument likewise fails. Illinois law provides the following absolute privilege for statements made during and in connection with an unemployment benefits proceeding:

> Sec. 1900.1. Privileged Communications. All letters, reports, or communications of any kind, either oral or written, from an employer or his workers to each other, or to the Director or any of his agents, representatives, or employees, made in connection with the administration of this [Unemployment Benefits] Act shall be absolutely privileged and shall not be the basis of any slander or libel suit in any court of this State unless they are false in fact and malicious in intent.

820 ILL. COMP. STAT. 405/1900.1 (2006).

In *Cianci v. Pettibone Corp.,* 698 N.E.2d 674, 680 (Ill. App. Ct. 1998), the Illinois Appellate Court held that a supervisor's statements at an unemployment compensation hearing enjoyed absolute privilege because there was no evidence of reckless disregard for the truth or falsity of the statements. Similarly, here, the allegedly defamatory statements were made during an unemployment benefits hearing, and Ptasznik has failed to set forth evidence that the testimony was false *and* malicious. Therefore, the district court did not err when it granted summary judgment on Ptasznik's defamation claim.

---

[7] (...continued)
823 N.E.2d at 190; *Larson v. Decatur Mem'l Hosp.*, 602 N.E.2d 864, 867 (Ill. App. Ct. 1992). In light of the result we have reached, we need not address this additional argument.

### III.  CONCLUSION

For the reasons set forth in this opinion, the judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*