NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued January 29, 2008
Decided February 12, 2008

**Before**

Hon. WILLIAM J. BAUER, *Circuit Judge*

Hon. MICHAEL S. KANNE, *Circuit Judge*

Hon. ILANA DIAMOND ROVNER, *Circuit Judge*

No. 05-3683

| | |
|---|---|
| CALVIN KEYS, JR., | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Northern District of |
| | Indiana, Fort Wayne Division |
| v. | |
| | No. 1:04-CV-214 WCL |
| FOAMEX, L.P., | |
| *Defendant-Appellee.* | William C. Lee, |
| | *Judge.* |

**O R D E R**

Calvin Keys, Jr., an African American, sued his former employer, Foamex,
L.P., claiming that Foamex's decisions to test Keys for drugs and terminate his
employment (after Keys failed his drug test) amounted to race discrimination in
violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17.
The district court granted Foamex's motion for summary judgment, and Keys now
appeals.  Because Keys has failed to establish a genuine issue of material fact, we
affirm the judgment of the district court.

The facts are construed in the light most favorable to Keys.  Foamex, a maker
of foam products, employs approximately 191 individuals at its Fort Wayne,
Indiana, facility.  Under Foamex's "Drug Free Workplace Drug Policy," Fort Wayne

employees are prohibited from reporting to work under the influence of alcohol or drugs (with some exceptions for nonimpairing prescription medications). To that end, "any employee who is involved in a serious or lost time on-the-job accident, and any employee whose on-the-job behavior indicates that he or she may be under the influence of alcohol or drugs, may be subjected to a medical examination or test to determine if there is a presence of alcohol or drugs in the employee's body." Violation of the policy—namely, reporting to work under the influence—is a basis for immediate termination, although it does not compel that result.

On April 1, 2003, an argument broke out between Keys and two other shift workers, Tony Romero and Juan Lopez, at a work station at the Fort Wayne facility. Keys accused Romero and Lopez of refusing to help him as he lifted heavy pieces of foam off of a machine. But Romero felt it was Keys who was not cooperating with his fellow workers, not the other way around, and threatened to call their shift supervisor, Mark Thomas. The disagreement did not escalate further—Romero did not make good on his threat to call Thomas—and the remainder of the shift passed peaceably.

The following day, however, Lopez and another Foamex employee, Garth Hazlett (who also had worked with Keys the day before), spoke to Thomas about Keys's behavior. After listening to the two employees recount that Keys had been uncooperative and at times unresponsive the day before, Thomas emailed their report and his own observations of Keys's "odd" behavior to Christopher Welbaum, Foamex's local human resources manager. Welbaum decided to have Keys tested immediately for drugs in light of what Welbaum believed to be uncharacteristic behavior. Welbaum reports that his decision was also influenced by long-standing rumors that Keys had used drugs during work hours with two other Foamex employees who Welbaum had recently terminated for violation of the drug policy.

Keys, meanwhile, knew nothing of these conversations and had just begun his shift that day when he was asked to accompany a supervisor off-site. Keys agreed to do so and was quietly escorted to a RediMed facility, where he submitted to a drug test. Upon returning to the Fort Wayne facility, a supervisor told Keys that he should go home and return only after Foamex received the results of the drug test. A few days later, however, RediMed informed Foamex that Keys had tested positive for marijuana. And Welbaum promptly terminated Keys for violating Foamex's drug policy.

Keys timely filed a discrimination charge with the Equal Employment Opportunity Commission and timely filed a complaint in the district court after receiving a right-to-sue letter. Keys alleged that Foamex had engaged in race discrimination by subjecting Keys—but not other similarly situated individuals outside of his protected class—to a drug test and then discharging him after he

failed the test.  Keys advanced two distinct claims in the district court: first, that the drug test was an act of race discrimination; and second, that the termination that flowed from failing the drug test constituted a second act of race discrimination.  But the district court rejected both arguments, instead granting summary judgment in favor of Foamex.  Regarding the first claim, the district court determined that, even accepting Keys's version of the facts as true, his drug test did not amount to an adverse employment action because it was performed in a routine fashion and did not amount to harassment or humiliation; thus, Keys could not make out a *prima facie* case of discrimination under the indirect method of *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802-03 (1973).  Regarding the second claim, the district court held that Keys similarly could not make out his *prima facie* case because he could not point to similarly situated individuals who, like Keys, tested positive for drugs or alcohol *but were not terminated.*

We review a district court's grant of summary judgment de novo, construing all facts and reasonable inferences in the nonmovant's favor.  *Perez v. Ill.*, 488 F.3d 773, 776 (7th Cir. 2007); *Phelan v. Cook County*, 463 F.3d 773, 778 (7th Cir. 2006).  Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits demonstrate that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  FED R. CIV. P. 56(c).  Accordingly, to survive summary judgment, the nonmoving party must provide specific facts from which a jury could reasonably find in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

Keys elected to proceed under the indirect, burden-shifting method of proving discrimination.  *See McDonnell Douglas*, 411 U.S. at 802-03.  In order to prevail, then, Keys must first establish a *prima facie* case by demonstrating that (1) he is a member of a protected class; (2) his performance met Foamex's legitimate expectations; (3) he was subjected to an adverse employment action; and (4) Foamex treated similarly situated employees outside of the protected class more favorably.  *See, e.g.*, *Barricks v. Eli Lilly and Co.*, 481 F.3d 556, 559 (7th Cir. 2007).  This court has recently held, in the termination context, that a plaintiff may alternatively satisfy the fourth element of the *prima facie* case by showing that "the employer needs to find another person to perform that job after the employee is gone . . . ." *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 846 (7th Cir. 2007).[1]  Once Keys has made out a *prima facie* case of discrimination, the burden of production shifts to Foamex to articulate a legitimate, nondiscriminatory reason for the

---

[1] Keys has not attempted to show that Foamex needs or has sought a replacement employee, however, so this avenue is foreclosed to him.  *See Pantoja,* 495 F.3d at 846; *cf. Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 687 n.2 (7th Cir. 2007).

adverse employment action. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006). But Keys can still prevail in the face of a legitimate, nondiscriminatory reason if he can show that the proffered reason is a mere pretext for discrimination. *Id.* Evidence of mistake will not suffice to show pretext, though; pretext "means a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995).

Keys first argues on appeal that the district court erred in finding that his drug test did not constitute an adverse employment action. Adverse employment actions contemplate more than inconvenience or minor irritation, and this court has held that a mandatory drug test is an actionable adverse employment action only if the test "is not performed in a routine fashion following the regular and legitimate practices of the employer, but [rather] is conducted in a manner that harasses or humiliates employees . . . ." *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001-02 (7th Cir. 2000). Keys argues that Foamex did not administer the drug test in a routine fashion consonant with its drug policy because Welbaum's suspicion turned on (1) vague rumors of Keys's previous drug use and (2) third-party reports of Keys's behavior—not the personal observations of Welbaum. Keys also argues that the content of those third-party reports, which he characterizes as indicating only poor performance, could not provide reasonable suspicion of drug use.

Keys's arguments are unpersuasive for a few reasons. First, Foamex's policy permits testing any employee whose behavior indicates the influence of alcohol or drugs. There is no requirement of first-hand observation by the decision maker. Second, the third-party reports were not limited to poor performance: in his email to Welbaum, Thomas wrote that on April 1, 2003 Keys "was slow to respond to work assignments, if he responded at all" and on the following day he was "acting oddly and in a way that was contradictory to his normal behavior." Finally, Foamex admits that the rumors of Keys's drug use were not alone sufficient to warrant a drug test. It was only after receiving reports of strange behavior that Welbaum chose to act. Accordingly, the decision to test Keys for drugs was consistent with Foamex's policy.

Furthermore, Keys has not shown that Foamex conducted the testing in a harassing or humiliating manner, as the law of this circuit requires. *See Stockett*, 221 F.3d at 1001-02. Keys rests instead on the conclusory assertion that because the test was (allegedly) governed by a discriminatory motive it was necessarily harassing and humiliating. But this ignores the adverse employment action requirement of the *prima facie* case, which must be met *before* any presumption of discrimination applies. *See Simple v. Walgreen Co.*, 511 F.3d 668, 671 (7th Cir. 2007). Apart from a few supervisors, Foamex employees were unaware of the drug test and the reason for Keys's absence from work. And nothing in Keys's account of the events of that day suggests that he felt harassed or humiliated at the time (or

that Foamex intended such a result)—although Keys obviously takes issue with whether the drug test *was warranted*, an altogether different issue.

Keys's final argument on this point is that the drug test was nonroutine because he is one of only two individuals to be tested under the suspicious-behavior prong of the Foamex policy, and the other individual was also African-American. But Keys neglects to mention that the other individual was one of the two with whom he was rumored to be using drugs. The third individual in that group, meanwhile, fell outside of the protected class but was also terminated for violation of the policy, albeit after a workplace accident triggered his drug test. For all of the foregoing reasons, the district court did not err in finding that Keys's drug test was not an adverse employment action. *See Stockett*, 221 F.3d at 1001-02.

Keys next contends that the district court erred in granting summary judgment to Foamex on Keys's termination claim because Keys could not show that similarly situated individuals outside of the class were treated more favorably. The similarly situated requirement typically demands a showing that two employees shared the same supervisor, were subject to the same standards, and engaged in similar conduct without significant differentiating or mitigating circumstances. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404-05 (7th Cir. 2007), *cert. granted,* 76 U.S.L.W. 3154 (U.S. Sept. 25, 2007) (No. 06-1431) (other grounds). But this is a flexible test that district courts may bend to analyze the particulars of any given case. *Id.* at 405. Whether two individuals are similarly situated is ultimately "a 'common-sense' factual inquiry—essentially, are there enough common features between the individuals to allow a meaningful comparison?" *Id.*

Keys argued in the district court that numerous similarly situated individuals outside of the protected class received more favorable treatment, and he now revives those arguments. The first is Crystal Martinez, a Foamex employee and the girlfriend of Welbaum's stepson. Welbaum knew that Martinez was arrested in connection with a drug raid at Welbaum's stepson's house, yet Welbaum did not require her to take a drug test. The second is Jason Moreno, a Foamex employee who reported to work visibly intoxicated approximately one year prior to Keys's termination. A Foamex supervisor sent Moreno home immediately, under the belief that Moreno was drunk, but Welbaum did not order a drug or alcohol test upon Moreno's return two days later, instead giving him a warning for "questionable usage." And finally Keys also claims that he is similarly situated to an entire group of unnamed individuals outside of the protected class, each of whom, like Keys, reported to work free of the influence of drugs and alcohol but, unlike Keys, were not tested or fired.

The district court correctly held that Martinez and those individuals who reported to work sober without incident were not similarly situated to Keys, but it

was error to reject Moreno as a comparator. Despite the circumstances of Martinez's arrest, Keys has failed to show—or even argue—that any Foamex employee suspected her of reporting to work under the influence of drugs or alcohol. And Welbaum submits that he had no reason to believe that Martinez used or was ever under the influence of drugs or alcohol while at work, the only grounds for termination under the policy. As for the proposed group, Keys is unlike those individuals who reported to work free of the influence of drugs and alcohol without incident. Keys asserts that his drug test revealed only that he had used marijuana in the recent past (which he admits)—not that he reported to work under the influence on April 1, 2003—and thus he belongs with his peers who similarly were not intoxicated. But Foamex first looks for signs of an employee being under the influence of drugs and alcohol, and then administers a test which, with respect to drugs, serves as an imperfect indicator of a policy violation, although enough to warrant termination. Keys has omitted an essential characteristic required of anyone similarly situated: behavior perceived as sufficiently out-of-the-ordinary or otherwise suspicious to warrant a drug test. And because the proposed group lacks that quality, its members cannot be similarly situated.

Moreno, however, offers a meaningful comparison that the district court should not have rejected. The two men shared the same supervisor (Welbaum), were subject to the same standards (the drug policy), and behaved in ways sufficiently similar to arouse suspicion of drug or alcohol use. *See Humphries*, 474 F.3d at 404-05. The district court understood the similarly situated inquiry to require a showing that another Foamex employee tested positive for drugs or alcohol but did not suffer termination. But this requirement is too narrow to vindicate the purpose of Title VII. Under the district court's reasoning, a discriminatory employer could evade detection by testing—and terminating—only those employees within the protected class, leaving them powerless to establish a *prima facie* case because of the absence of similarly situated employees. Far better to require that Keys identify an employee outside of the protected class (and under Welbaum's supervision) who exhibited unusual behavior or other signs of intoxication in the presence of Foamex employees but did not face a drug or alcohol test. *See id.* Moreno is just such an individual.

Even if Keys can complete his *prima facie* case for his termination claim, though, he still cannot show that Foamex's legitimate, nondiscriminatory reasons for testing and termination are pretextual. *See Ptasznik*, 464 F.3d at 696. Foamex claims that its decision to test Keys rests on reports of strange behavior at work and rumors of past drug use, and its decision to terminate Keys stems from the results of his drug test. Welbaum explains the difference in Moreno's and Keys's treatment in terms of their respective intoxicants. Welbaum believed that Moreno was under the influence of alcohol; he claims that he would have ordered a test had he known of the supervisor's suspicion on the day in question. But according to Welbaum, two

days later, the test would have demonstrated nothing because alcohol leaves the body much faster than marijuana. Truthfully, there are methods to test for alcohol consumption well after two days have expired, *see, e.g., The Role of Biomarkers in the Treatment of Alcohol Use Disorders*, SUBSTANCE ABUSE TREATMENT ADVISORY, Sept. 2006, Vol. 5, Issue 4, at 4, Ex. 2.[2] But this cannot help Keys because "[t]he focus of a pretext inquiry is whether the employer's reason is honest, not whether it is accurate or wise." *Barricks*, 481 F.3d at 560. And Keys has not provided any reason to doubt that Welbaum honestly believed that it was too late to test Moreno when he learned of his behavior two days later. Although Welbaum's convenient explanation for disparate treatment is troubling, Keys simply has not developed any cogent argument that this explanation—or any of the explanations given for Keys's testing and termination—is pretextual.

For these reasons, we AFFIRM the judgment of the district court.

---

[2] http://kap.samhsa.gov/products/manuals/advisory/pdfs/0609_biomarkers.pdf (last visited Feb. 12, 2008).