# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-1034

KAMALJIT S. PAUL, Doctor,

*Plaintiff-Appellant,*

*v.*

THEDA MEDICAL CENTER, INCORPORATED,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 05 C 54—**William C. Griesbach,** *Judge.*

———————

ARGUED SEPTEMBER 6, 2006—DECIDED OCTOBER 13, 2006

———————

Before FLAUM, *Chief Judge,* and BAUER and POSNER, *Circuit Judges.*

BAUER, *Circuit Judge.* Dr. Kamaljit S. Paul, an Asian-Indian man, sued Theda Clark Medical Center ("Theda Clark"), claiming that he was discriminated against because of his race in violation of 42 U.S.C. § 1981 and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. Dr. Paul also claimed that Theda Clark breached its own bylaws by denying him active staff membership at the medical center. The district court granted summary judgment in favor of the defendant. We affirm.

## I.  Background

Dr. Paul was born in India. He received a Master of Surgery from the University of Lucknow in India and a Master of Neurosurgery from the University of Manchester in England. In 1984, Dr. Paul came to the United States to participate in a two-year neurotrauma fellowship. After completing his fellowship, Dr. Paul moved to Wisconsin and entered private neurosurgery practice. From 1986 to 1992, Dr. Paul held medical staff privileges and practiced neurosurgery at Mercy Medical Center and St. Elizabeth Hospital. In 1991, Dr. Paul also received active staff membership at Theda Clark in Neenah, Wisconsin. Dr. Paul maintained active status at Theda Clark until May 23, 2003.

In 1998, the American College of Surgeons certified Theda Clark as a Level II trauma center. The American College of Surgeons provides guidelines and regulations regarding the certification process of trauma centers in their "Gold Book" formally titled *Resources for Optimal Care of the Injured Patient.* According to the Gold Book, Level II trauma certification requires that all neurosurgeons who participate in the trauma program be board certified.

Theda Clark's bylaws require that physicians appointed to active staff membership be available to provide "specialty care coverage for the emergency department." Dr. Paul is not board-certified by the American College of Surgeons in neurosurgery. From 1992 to 2003, Dr. Paul never performed surgery at Theda Clark. However, in order to retain his active staff membership, Dr. Paul reapplied approximately every two years.[1] In January of 2003, Dr. Paul applied to

---

[1] Despite the fact that Dr. Paul was a non-board-certified neurosurgeon, he was allowed to remain an active staff member after Theda Clark was designated a Level II Trauma Center in 1998. Theda Clark contends that Dr. Paul's re-applications should

(continued...)

extend his active status, anticipating that he would begin performing surgery there for insurance reasons.[2] Dr. Paul was informed that his application for active status had been denied because as a non-board-certified neurosurgeon, he could not provide trauma call coverage at Theda Clark's Level II trauma center. Dr. Paul appealed the initial determination to Theda Clark's hearing committee. In upholding the denial, the hearing committee stated that the denial was based solely on Dr. Paul's "inability to meet the requirements outlined in the By-Laws and the American College of Surgeons Gold Book to provide call coverage for trauma and pediatric patients at Theda Clark." Theda Clark's hearing committee instead extended Dr. Paul courtesy status.[3] As a courtesy staff member, Dr. Paul retained the same clinical privileges that he had during his active status.[4]

On January 20, 2005, Dr. Paul filed a two-count complaint in federal district court alleging that Theda Clark

---

[1] (...continued)
have been denied in 1999 and 2001, but his status was mistakenly overlooked due to his inactivity at the hospital.

[2] Prior to December 2002, both Theda Clark and Mercy Medical Center accepted Touchpoint Insurance on behalf of its surgical patients. A significant number of Dr. Paul's patients were insured by Touchpoint. In December of 2002, Mercy Medical no longer accepted Touchpoint Insurance, and as a result, Dr. Paul planned to utilize Theda Clark more frequently in 2003.

[3] While physicians with active staff membership at Theda Clark may perform as many surgeries or procedures as their practice requires, courtesy staff members may not admit more than twenty patients every two years.

[4] Clinical privileges refer to the types of treatments, procedures, and care each physician is entitled to provide at Theda Clark. In contrast, staff membership is reflective of the level of patient involvement and administrative responsibilities of the physician.

discriminated against him by declining his application for active staff membership. The first count alleged that Theda Clark had a discriminatory motive or purpose based on Dr. Paul's race in modifying its contract with him in violation of 42 U.S.C. § 1981. The second count alleged that the modification of Dr. Paul's staff membership was a breach of the parties' contract according to Theda Clark's bylaws. Dr. Paul filed an amended complaint on May 18, 2005, adding an additional civil rights violation under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d). In this count, Dr. Paul claimed that Theda Clark violated the Civil Rights Act by denying his application for active staff membership because Theda Clark receives Medicare and Medicaid funding and discriminatory actions are not tolerated in an institution that receives federal funding.

On August 29, 2005, Theda Clark moved for summary judgment, and on December 20, 2005, the district court granted the defendant's motion on all three causes of action. The district court found that Dr. Paul failed to establish that (1) he was qualified for active staff membership, (2) Theda Clark's basis for declining his application for active staff membership was pretextual, and (3) Theda Clark's bylaws entitled him to active staff membership. This timely appeal followed.

## II. Discussion

We review the district court's grant of motion for summary judgment *de novo. Sartor v. Spherion Corp.*, 388 F.3d 275, 277 (7th Cir. 2004). Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this burden, the nonmoving party must then go

beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e). This court must draw every justifiable inference from the record in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The existence of merely a scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a summary judgment motion. *Id.* at 252.

### A.  Dr. Paul's § 1981 and Title VI Claims

Dr. Paul contends that he provided sufficient evidence of racial discrimination to demonstrate a cause of action under the Civil Rights laws. The framework governing liability under Title VII also applies to section 1981 claims. *Gonzalez v. Ingersoll Milling Machine Co.*, 133 F.3d 1025, 1035 (7th Cir. 1998). Direct or indirect evidence can be used to prove racial discrimination in an employment setting. *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1113 (7th Cir. 1992). Because Dr. Paul did not present direct evidence of racial discrimination, the district court used the burden shifting formula established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to determine whether discrimination occurred.

In order to establish a *prima facie* case of discrimination, Dr. Paul must present by a preponderance of the evidence that: (1) he was a member of a protected class; (2) he was qualified for the job in question; (3) he suffered an adverse employment action; and (4) the defendant treated other similarly-situated employees who were not members of the class more favorably. *McDonnell Douglas*, 411 U.S. at 802; *Gonzalez*, 133 F.3d at 1032. If a *prima facie* case is established, the burden shifts to the defendant to produce evidence of a legitimate, non-discriminatory reason for its

decision. *Id.* If the defendant produces such a reason, the plaintiff has an opportunity to show that the articulated explanation was in fact pretext. *McDonnell Douglas*, 411 U.S. at 804; *Gonzalez*, 133 F.3d at 1032. A pretext is a "lie, specifically a phony reason for some action." *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999).

Dr. Paul failed to present sufficient evidence to satisfy the second and fourth prongs of the *McDonnell Douglas* test. First, Dr. Paul did not establish that he was qualified for active staff membership at Theda Clark. Although both parties agree that Dr. Paul is a non-board-certified neurosurgeon, Dr. Paul argues that Theda Clark does not actually require board certification for active neurosurgeons. Theda Clark's bylaws state that physicians appointed to active staff membership must be available to provide "specialty care coverage for the emergency department." Additionally, in order to maintain its Level II trauma center designation, Theda Clark must follow the requirements listed in the American College of Surgeons' Gold Book. The Gold Book states:

> [b]asic to qualification for trauma care for any surgeon is board certification in a surgical specialty recognized by the American Board of Medical Specialties. . . . The board certification requirement applies to the general surgeon, orthopedic surgeon, and neurosurgeon. These requirements are also essential for the emergency medical physicians in Level I and II centers and desirable for those in Levels III and IV. These requirements are desirable for anesthesiologists.

Theda Clark's bylaws require its active staff members to participate in trauma call coverage and neurosurgeons providing call coverage for Level II trauma centers are required to be board certified. Thus, Dr. Paul does not qualify for active staff membership at Theda Clark.

Second, Dr. Paul failed to produce sufficient evidence that Theda Clark treated other non-board-certified neurosur-

geons who were not of Asian-Indian descent more favorably. In fact, all other neurosurgeons with active staff membership at Theda Clark are board certified. The only non-board-certified physician with active staff membership that Dr. Paul has identified is Dr. Behrens, an anesthesiologist.[5] The Gold Book states that board certification is "essential" for neurosurgeons but only "desirable" for anesthesiologists. Therefore, anesthesiologists are not required to be board certified to provide trauma call coverage at Theda Clark. This is not the case for neurosurgeons. Because Dr. Paul failed to produce any evidence that he was treated differently than other neurosurgeons, he did not establish a *prima facie* case of discrimination.

Even had Dr. Paul established a *prima facie* case of discrimination with respect to Theda Clark's decision not to extend his active staff membership, there is not enough evidence of pretext in the record to survive summary judgment. Dr. Paul claims that Theda Clark's reason for denying him active staff membership—lack of board certification—was pretextual and that Theda Clark's actual intent was to discriminate against him based upon his race.

In support of his position, Dr. Paul first testified that he requested surgery time in March of 2003, and Theda Clark failed to respond to his request. Dr. Paul insists that he did not receive the surgical time because of his ethnic, religious and/or cultural beliefs. However, Dr. Paul never followed up with Theda Clark to determine why they had not responded to his request. Additionally, Dr. Paul testified that he applied for privileges at Theda Clark in 1986, but he did not

---

[5]   Despite the fact that Dr. Ullrich is a board certified orthopedic surgeon, Dr. Paul also identified Dr. Ullrich, claiming that Dr. Ullrich was treated differently because he was not required to provide call coverage at Theda Clark. However, the record reflects that Dr. Ullrich does provide emergency call coverage in orthopedic spine trauma.

receive privileges until 1992. Once again, Dr. Paul assumes that Theda Clark delayed his application because of his ethnicity.

In another attempt to show pretext, Dr. Paul claims that in 1994 or 1995 a patient told him that a Theda Clark physician, since retired, told the patient that "Dr. Paul should go back from [where] he has come from, he should take his camel back there." There is no evidence that this retired doctor was involved in or at all influenced Theda Clark's decision to deny Dr. Paul active staff membership. The statement is irrelevant. *See Rozskowiak v. Village of Arlington Heights*, 415 F.3d 608, 611-13 (7th Cir. 2005) (concluding that plaintiff's supervisor's comment that plaintiff "would probably be losing [his] job because [he] was a stupid Polack," was unrelated to the plaintiff's termination, and the plaintiff was terminated for legitimate, job-related reasons). Theda Clark's requirement that a neurosurgeon with active staff membership be board certified is a legitimate and non-discriminatory reason for denying Dr. Paul active status. Because Dr. Paul fails to discredit this reason, the district court did not err when it granted summary judgment in favor of Theda Clark on the § 1981 and Title VI claims.

## B.  Dr. Paul's Breach of Contract Claim

Dr. Paul argues that Theda Clark violated its bylaws by denying him active staff membership. Dr. Paul cites *Seitzinger v. Community Health Network*, 676 N.W.2d 426, 433 (Wis. 2004) and *Bass v. Ambrosius*, 520 N.W.2d 625, 627 (Wis. Ct. App. 1994), in support of the general proposition that a hospital's bylaws can constitute a binding contract between the hospital and its staff. The Wisconsin Supreme Court also held that hospital bylaws are reviewed under a deferential standard and a hospital's interpretation of its bylaws should stand if reasonable. *Seitzinger,* 676 N.W.2d at 433.

Even if Theda Clark's bylaws create a contract between Theda Clark and Dr. Paul, there is no breach of contract. Theda Clark's bylaws state:

> [t]he active medical staff shall consist of physicians, dentists, and podiatrists who regularly admit patients to the hospital or provide services to hospital patients, who are located closely enough to the hospital to provide continuous care to their patients, and who assume all the functions and responsibilities of appointment to the active medical staff including where appropriate, service on medical staff and department committees, specialty care coverage for the emergency department and consultation assignments.

The bylaws clearly state that an active staff member assumes responsibilities that include providing "specialty care coverage for the emergency department." Because Theda Clark is a Level II trauma center, all neurosurgeons that provide trauma call coverage must be board certified. Dr. Paul argues that he did not apply to become a member of the trauma team and therefore was not required to be board certified.[6] However, the bylaws do not state that an active staff member is allowed to opt out of trauma coverage. On the contrary, if Dr. Paul was appointed to active staff membership, he would be required to provide "specialty care coverage" according to Theda Clark's bylaws. Therefore, the district court did not err when it granted summary judgment on Dr. Paul's breach of contract claim.

---

[6]   Dr. Paul also argues that Theda Clark's bylaws include a "grandfather clause" that exempts him from the requirement of board certification. However, the clause is located under Article VI of the bylaws, which is entitled "clinical privileges" and pertains to clinical privileges rather than staff membership. This clause entitles Dr. Paul to retain his clinical privileges but does not entitle him to active staff membership.

### III.  Conclusion

For the reasons stated above, we AFFIRM the district court's grant of summary judgment.


A true Copy:

       Teste:


_____
***Clerk of the United States Court of***
***Appeals for the Seventh Circuit***