In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 05-4591

MARCOS PEREZ,

*Plaintiff-Appellant*,

*v.*

STATE OF ILLINOIS,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 03 C 1386—**Joe Billy McDade**, *Judge.*

———————

ARGUED JANUARY 10, 2007—DECIDED JUNE 8, 2007

———————

Before POSNER, MANION, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.* Marcos Perez sued the State of Illinois, Department of Corrections, alleging that he was terminated and later, after reinstatement, denied a promotion because of his national origin in violation of Title VII. The district court granted summary judgment in favor of the defendant. Perez appeals, and we affirm.

I.

Marcos Perez, an American of Hispanic ancestry, has been employed by the Department of Corrections ("Department") since January 1988, and began serving as a Captain in 1998. In 2002, Correctional Officer Debra Riley filed an incident report with the Department alleging that Perez had sexually harassed her, listing numerous instances of unwanted touching and comments of a sexual nature. After the Department conducted an investigation on Riley's report, Correctional Captain Frank Shaw held a hearing and submitted a memorandum to the warden recommending that Perez receive a thirty-day suspension pending discharge. Shaw premised his recommendation upon the testimony and evidence presented at the hearing, including the investigative report which concluded that Perez committed sexual harassment when he "touched Officer Debra Riley on her back, touched Riley's hair, commented about Riley's husband, commented about Riley's buttocks, breasts and menstrual period, commented about Riley's relationships or alleged sexual relationships with other employees, and hugged Riley and permitted Riley to sit on his lap." The warden concurred with the recommendation, and the Department Director approved the discipline. Accordingly, on May 3, 2002, Perez was discharged. Perez appealed to the Civil Service Commission. After a de novo hearing, the Commission reversed the warden's decision and imposed a thirty-day suspension in addition to Perez's previously imposed suspension, but without discharge. The Commission's Administrative Law Judge ("ALJ") noted that he questioned Riley's credibility and that Perez presented witnesses who testified that Riley and Perez were friendly. The ALJ, however, concluded that while the Department could not prove sexual harassment, it did

prove significant conduct and comments that violated Department rules of conduct, thus warranting a sixty-day suspension.[1]

Following the ALJ's decision, the Department reinstated Perez at the rank of captain. In 2003, due to budget cutbacks, the position of captain within the Department was eliminated statewide. Part of the captain elimination plan was for present captains to assume vacant lieutenant, correctional officer, or youth supervisor positions at the same facility or in the same county or to apply for a new shift commander position. There were four open lieutenant slots and the new shift commander position at the facility where Perez was stationed. Perez applied for a shift commander position, but garnered the lowest score out of the twelve applicants for the three available slots. Then, Perez voluntarily assumed a correctional officer position and has since been promoted to shift commander, where he serves to date.

---

[1] Specifically, the ALJ determined that Perez violated Employee Responsibilities and Rules of Conduct §§ 13 and 23 which state:

> Section 13: Employees shall conduct themselves on and off duty in such a professional manner as not to reflect unfavorably on the Department and shall not engage in conduct unbecoming an employee or which impairs the operations of the Department. Employees shall not engage in conduct which impairs their abilities to perform their duties and responsibilities in an impartial manner. Employees shall notify their supervisors when their job duties may give rise to a conflict of interest.

> Section 23: Conduct of staff on duty is to be professional in nature. Cursing, loud, boisterous behavior, arguments, horseplay or other unprofessional behavior is prohibited.

Perez filed suit alleging that the Department violated Title VII, 42 U.S.C. § 2000e-2(a)(1), et seq., by firing him because of his national origin and similarly not promoting him to shift commander because of his national origin. The Department filed a motion for summary judgment which the district court granted, concluding that Perez failed to establish that others who were similarly situated were treated more favorably with regard to his termination claim and that the Department's non-discriminatory rationale for not promoting him was not pretextual. Perez appeals.[2]

II.

We review a district court's grant of summary judgment de novo. *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 631 (7th Cir. 2004). All reasonable inferences from the evidence are drawn in the light most favorable to the non-moving party. *Id.*

A plaintiff can prove national origin discrimination under either the direct or indirect method. *See Sun v. Bd. of Tr. of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007). In this case, Perez proceeds solely under the indirect method governed by *McDonnell-Douglas. Paul v. Theda Med. Ctr., Inc.*, 465 F.3d 790, 794 (7th Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Under *McDonnell Douglas*, the plaintiff must establish a prima facie case of discrimination by showing that: "(1) he was a member of a protected class; (2) he was qualified for the

---

[2] Perez also filed a retaliation claim, and the district court granted the Department summary judgment on that claim as well, but Perez does not appeal from that decision.

job in question; (3) he suffered an adverse employment action; and (4) the defendant treated other similarly situated employees who were not members of the class more favorably." *Id.* (citations omitted). A similarly situated employee is one who is "comparable to plaintiff in all *material* respects," *Crawford v. Ind. Harbor Belt RR. Co.*, 461 F.3d 844, 846 (7th Cir. 2006). If the plaintiff establishes a prima facie case, then the burden shifts to the defendant to present evidence of a legitimate, non-discriminatory reason for its actions. *Paul*, 465 F.3d at 794. If the defendant makes that showing, then the burden shifts back to the plaintiff to show that the defendant's reason is pretextual, i.e., a "lie" or a "phony reason" for the action. *Id.* (citation omitted).

On his first claim, that the Department fired him because of his national origin, Perez's membership in a protected class, qualification for the captain position, and receipt of an adverse employment action are not at issue regarding the Department's firing of Perez. The sole question is whether Perez presented evidence that the Department treated similarly situated employees more favorably. While in the district court, Perez argued that there were three individuals who he claimed to be similarly situated to himself. On appeal, Perez sufficiently presents an argument for only one of the three, Lieutenant Brad Livingston.[3] As perfunctory and undeveloped arguments are deemed waived, *see Estate of Moreland v.*

---

[3] Perez stated in his brief, "The only issue for the District Court on Count I, then, was whether plaintiff had shown Lytle, Small, or Livingston to be similarly situated. For purposes of this brief, plaintiff will focus on Livingston." Thus any claim that Lytle or Small is similarly situated is waived on appeal.

No. 05-4591

*Dieter*, 395 F.3d 747, 759 (7th Cir. 2005), we will only consider whether Livingston is substantially similar to Perez.

Like Perez, Livingston was charged with violating Sections 13 and 23 of the Employee Responsibilities and Rules of Conduct. Livingston was disciplined for a single instance of consensual kissing and embracing a subordinate employee while on duty. For this "unprofessional conduct and inappropriate behavior while on duty," Livingston was suspended for five days.

Livingston is not similarly situated to Perez in either position or conduct. Unlike Perez, Livingston was not a captain, but a lower ranked lieutenant. Further, Livingston was punished for a single instance, not activity that spanned a two-year period.

Perez, however, focuses on the fact that Livingston was charged with violating the same Department directives as he was, but received lesser punishments, namely suspension rather than termination. While identical rule violations may be helpful in determining whether there has been discrimination, it is not dispositive of similarity. *See Johnson v. Artim Transp. Sys., Inc.*, 826 F.2d 538, 543 (7th Cir. 1987) ("Even if a plaintiff shows different treatment after violations of the same rule, he or she might not succeed in establishing a prima facie case."). Perez responds by citing *Davis v. Wisconsin Department of Corrections*, 445 F.3d 971, 979 (7th Cir. 2006), claiming that his case should nonetheless have been presented to the jury because he and Livingston were charged with violating the same rules. However, this case is distinct from *Davis*. In *Davis*, the individuals at issue not only violated the "same work rule, [but] [m]ore importantly, the [Department] evaluated the severity of each man's violation and

placed all three violations in category B. . . ." *Id.* Conversely, here, while there is an identical rule violation, there was no severity classification amongst the rule violations. Rather, although in this case the same rules were implicated, the offenses, one being a consensual, single instance and the other being unwelcomed and sustained conduct, are of significantly different severity such that they are not comparable. Therefore, Livingston is not similarly situated to Perez. Because Perez does not present a similarly situated individual, we affirm the district court's grant of summary judgment in favor of the defendant on Perez's claim of national origin discrimination stemming from his initial discipline of termination in connection with the Riley complaint.

In his remaining claim, Perez asserts that the Department denied him a promotion to shift commander because of his national origin. In response, the Department states that Perez did not receive one of the three shift commander positions because Perez scored the lowest on the examination given to the twelve applicants for the job. Perez argues in response that the Department's purported reason for his denial, namely his test score, was pretextual.

To show pretext, "a plaintiff must show that (a) the employer's nondiscriminatory reason was dishonest; and (b) the employer's true reason was based on a discriminatory intent." *E.E.O.C. v. Target Corp.*, 460 F.3d 946, 960 (7th Cir. 2006) (citations omitted). In the absence of direct evidence of pretext, the plaintiff must "prove pretext indirectly." *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 732 (7th Cir. 2001). With indirect evidence, the plaintiff must show that the employer's reason is not credible or that the reason is factually baseless. *See Guerrero v. Ashcroft*, 253

F.3d 309, 313 (7th Cir. 2001) (citations omitted). "[The plaintiff] must also provide evidence of at least an inference that the real reason for [the adverse employment action] was discriminatory." *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999) (citations omitted).

Perez claims he has presented sufficient evidence of pretext by demonstrating that there is no factual basis for the test scores he received. Shaw and William Smith both administered and scored the test. The test contained four main categories: job knowledge, leadership, verbal communication skills, and education/training/experience. Job knowledge and education/training/experience contained two questions, and the remaining categories contained only one question each. Shaw and Smith assigned an overall score to each individual category with an available four points for each.

For the job knowledge category, Perez received a score of 1.0. Perez argues that there is no factual basis for this score, pointing to the score received by another candidate. Under job knowledge, each candidate was asked, "What steps are taken when dealing with an extremely high-risk inmate?" Like Brian Kane, the top scoring candidate, Perez incorrectly answered that a high risk inmate wears a red tag, but Perez received a score of 1.0 while Kane received a score of 4.0. Perez also points to his score under the education/training/experience category, under which each candidate was asked, "What is your level of education?" Perez had earned a two-year degree in law enforcement and attended three years of college in law enforcement, and Donald West, the second ranked candidate, had earned a G.E.D. For education/training/ experience, Perez received a score of 3.0, and West received a score of 3.5. Perez contends that these two examples exhibit test score irregularities which evince that the scores

are a false gauge, and, consequently, the Department's reason for not promoting him to shift commander is pretextual for national origin discrimination.

Perez's claim that there is no factual basis for the test scores fails because the scores for the job knowledge and the education/training/experience categories were not derived solely from the incorrect answer and levels of education, respectively. As to job knowledge, each candidate was asked two questions, and the assigned scores reflect the responses to both. A review of Perez's responses and Kane's responses to the job knowledge questions reveals that Kane's answers were considerably more detailed and exhaustive than those Perez offered. Similarly, the education/training/experience category included another question about the candidate's law enforcement and training experience. West, who received a slightly higher score, had participated in a greater number of training sessions than Perez and served in a variety of capacities in which Perez did not. To assert pretext based solely on the shared incorrect answer or differences in educational levels does not fairly or adequately represent the complete grounds for the assigned scores. Moreover, a review of these respective categories reveals a basis for the scoring differential. "It is true that an employer's use of subjective criteria may leave it more vulnerable to a finding of discrimination, when a plaintiff can point to some objective evidence indicating that the subjective evaluation is a mask for discrimination," *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1170 (7th Cir. 1998). Perez has not, however, pointed to such objective evidence or any evidence indicating that the test scores were pretextual.

Perez insists that our opinion in *Thanongsinh v. Board of Education*, 462 F.3d 762 (7th Cir. 2006), is "on all fours with this case." In *Thanongsinh*, the plaintiff, who was of Asian

descent, did not bring materials that he was required to bring to an exam administered by the defendant, and he received a zero on that test portion, apparently simply because he did not have the materials. However, a white counterpart who also failed to bring his testing materials was questioned and received ten points out of a possible ten points on that test portion. *Id.* at 780. Additionally, Thanongsinh presented evidence indicating a discriminatory bias by the decisionmakers. We held in *Thanongsinh* that "although each piece of evidence offered by Mr. Thanongsinh may not be sufficient standing alone to create a material issue of fact for trial, when this evidence is considered in the aggregate, a reasonable jury could find discriminatory animus in the scoring of the exam." *Thanongsinh*, 462 F.3d at 780. Perez's case is distinct from *Thanongsinh*. Unlike Thanongsinh, Perez was permitted to answer all questions and has failed to show that he was treated differently from other candidates in terms of the scores assigned based on the answers given for the entire section. Further, there is no evidence of comments or remarks from which one could infer that Perez's national origin was a consideration in the testing process. Therefore, Perez's reliance on *Thanongsinh* is misplaced.

Perez also claims that Smith's unfamiliarity with the test scoring method shows pretext. In support of this argument, Perez points to Smith's deposition testimony, wherein he stated that he was not a "security person" and was unable to provide the information that would constitute a score 4 answer. Perez concludes that Shaw "was dictating the [test] scores" of the shift commander candidates. However, Smith also stated in that deposition that he based his score on how well a candidate articulated the answer, and that he "would look at the questions and

listen to the answers and use my best judgment." Perez presents no evidence that Smith did not consistently score candidates and provides no evidence undermining the independence of Smith's scores that would support his assertion that Shaw "was dictating the scores" of the shift commander candidates. Moreover, even if Shaw had dictated the scores, that would be insufficient to establish pretext, absent evidence that Shaw's scores were also pretextual. Therefore, Perez's invocation of Smith's deposition testimony fails to show pretext.

Finally, in an attempt to assert pretext, Perez argues that Shaw lied about his knowledge of an unrelated investigational interview. Shaw signed a memorandum indicating that he was present when Perez was interviewed the morning of June 23, 2003, by Internal Affairs about an allegation that Perez had threatened to shoot the Governor. Perez was tested later that day for the shift commander position. During his deposition for this case, Shaw responded that on the day of Perez's interview for shift commander, he was unaware that Perez had been interviewed that morning by Internal Affairs. Perez claims that Shaw's lie about the Internal Affairs investigation shows that the Department's reason for denying him the shift commander position is pretext. Even assuming that Shaw had lied (as opposed to having honestly forgotten about the timing of the meetings), this does not show pretext because the Internal Affairs interview was completely unrelated to Perez's shift commander interview and the score he received. *See Jackson v. E.J. Brach Corp.*, 176 F.3d at 983.[4]

_____

[4] Obviously a threat to "shoot the Governor" could be a serious charge. Presumably the investigation was inconsequential
(continued...)

In sum, Perez's assertions that Shaw lied or that Smith was unfamiliar with the test answers do not alter the quality of the answers Perez gave. Moreover, they do not bridge the gap between Perez's twelfth place finish and third place, the last place which qualified for a shift commander position. Therefore, Perez does not establish that the Department's use of the test scores to select candidates is pretextual as either factually baseless or not the actual motivation.

### III.

In the absence of a similarly situated employee or pretext, Perez has failed to prove a Title VII claim premised on national origin for either his termination or not assuming the position of shift commander within the Department. Accordingly, the district court properly granted summary judgment to the Department, and we AFFIRM.

---

[4] (...continued)
since Perez was interviewed for a promotion later in the day. Even assuming the charge was unfounded and Smith's sign-off was routine, his failure to recall the timing seems unusual. But Perez makes nothing more of this investigation affecting the denial of the promotion.

No. 05-4591                                                           13

A true Copy:

    Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
