In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 06-1487 & 06-2716

EVELYN BENDERS,

*Plaintiff-Appellant,*

*v.*

BELLOWS AND BELLOWS,

*Defendant-Appellee.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 04 C 7326 & 06 C 324—**Samuel Der-Yeghiayan,** *Judge.*

———————

ARGUED OCTOBER 22, 2007—DECIDED FEBRUARY 12, 2008

———————

Before EASTERBROOK, *Chief Judge*, and KANNE and
EVANS, *Circuit Judges*.

EVANS, *Circuit Judge.* The plaintiff, Evelyn Benders,
alleges that she was fired in April 2004 in retaliation
for filing an age and race discrimination claim with the
Equal Employment Opportunity Commission (EEOC)
and for threatening to report a dispute about her em-
ployment status to the IRS. The defendant law firm,
Bellows and Bellows, P.C. (B&B),[1] maintains that it

———————

[1] According to an Internet directory, Lawyers.com, Bellows and
Bellows, P.C. is a "Boutique Chicago law firm concentrating
(continued...)

terminated Benders' employment in May 2003, well before she engaged in any protected activities. The twist in this case is that B&B's decision to fire Benders was communicated to her in rather uncertain terms by the firm's owner and president, Joel Bellows, who, despite his marriage to Laurel Bellows (the other "B" of B&B), had a romantic relationship with Benders during the first several years of her employment.

Notwithstanding these and other complexities, the district court found, as a matter of law, that B&B fired Benders on the earlier date. Consequently, the court granted B&B's motion for summary judgment on all three counts in the complaint. *Benders v. Bellows and Bellows*, No. 04 C 7326, 2006 WL 208713 (N.D. Ill. Jan. 24, 2006). The case[2] is now before us on Benders' appeal.

As we must, we accept Ms. Benders' allegations as true at this stage of the proceedings. As so viewed, the facts are that B&B hired Benders, an African-American woman now in her fifties, as a legal secretary in 1996 and promoted her to the position of office administrator about a year later. In that position, Benders took charge of the firm's computer system, invoicing, and personnel matters, including the hiring, firing, and training of employees. Benders, during all this time, did not have an employment contract with B&B.

Shortly after starting at the firm, Benders and Mr. Bellows began a romantic relationship, which ended

---

[1] (...continued)
in corporate and employment law, including litigation, negotiating and counseling."

[2] The "case" we refer to here (06-1487) is Benders' three-count claim in which she is represented by counsel. We will discuss Benders' *pro se* appeal from the district court's dismissal of her related sex discrimination case (06-2716) separately, at the end of this opinion.

about 5 years later. From time to time during this period, Mr. Bellows helped Benders financially, issuing her checks, drawn on the firm, to purchase various personal items. B&B maintained a record of the monies given to Benders, which she considered gifts, not loans or income. B&B, on the other hand, claims that these monies were not gifts. It issued 1099 IRS forms to Benders for 2002 and 2003 reflecting that these payments were income.

In May 2003, Mr. Bellows had a private conversation with Benders in which he told her that his wife and another principal of the firm, Nick Iavarone, were "campaigning to get [Benders] out" and that she should begin to look for other employment. Benders alleges that Mr. Bellows assured her that she would remain employed with the firm until she found "the right job." Benders suspected that the real reason for her future departure was that B&B did not want an older black woman around after it moved into its new offices. According to the firm, however, the decision to fire Benders was made because Mrs. Bellows did not believe Benders was competent as office administrator. B&B maintains that Mr. Bellows offered to keep Benders on the payroll as an act of generosity until she found another job.

Benders claims that, a few weeks later, Mr. Bellows told her that the firm had hired a "moving consultant," who would "share some of the responsibilities" with Benders, but that "no one would be the wiser." In July 2003, Cinthia LeGrand, a white woman approximately 10 years younger than Benders, began her employment at B&B. After LeGrand's arrival, Benders' duties at the firm generally diminished. According to Benders, however, at times, her responsibilities would "come back," causing her to question her role at B&B. B&B concedes that it never stripped Benders of her title as office administrator, nor did it ever reduce her then-current salary

until her last day at the firm, about 9 months after LeGrand started.

In December 2003, Mr. Bellows approached Benders and proposed that, instead of making a contribution to the firm's 401(k) plan on her behalf for 2003, he would assume responsibility for a civil judgment entered against Benders regarding her student loans. Mr. Bellows allegedly explained to Benders that, to effectuate this arrangement, he would have to reclassify her as an independent contractor for the last few weeks of 2003. Benders admits that she agreed to forego the payment, but only on the condition that she be returned to employee status by mid-January 2004. From that point on, however, Benders' paychecks bore the notation, "independent contractor." Despite the change in status, B&B concedes that it continued to deduct federal taxes from Benders' paycheck.

In February 2004, in response to her complaints, Mr. Bellows told Benders that he was going to put her back on the payroll long enough for her to collect unemployment, for approximately 5 weeks, and then she would have to leave the firm. But Benders' paychecks remained the same. Benders was never asked to sign an independent contractor agreement, which she knew to be the firm's practice.

Later that month, Benders filed a claim with the Illinois EEOC, alleging race and age discrimination in connection with her apparent demotion and B&B's hiring of LeGrand. Her charge appended e-mails written by Mr. Bellows. One of the e-mails referred to Benders as "Seabiscuit" who "should have been put down" long ago. In another e-mail, Mr. Bellows said that African-American members of his staff were making Benders' employment situation "a racial thing." After Benders filed the charge, she claims that Mr. Bellows became increasingly hostile towards her and made her working conditions difficult.

According to B&B, however, it was Benders who caused problems. The firm claims that she became disruptive and insubordinate, did not actively seek other employment, deliberately caused problems for LeGrand, and did not perform certain duties.

On April 12, 2004, B&B filed its position statement with the EEOC. Benders alleges that, 3 days later, Mr. Bellows approached her and told her that because she had filed an "awful EEOC charge," he would not consider paying her severance. B&B denies that Mr. Bellows made any such statement.

On April 14, 2004, after receiving another "independent contractor" paycheck, Benders reminded Mr. Bellows that she planned to refinance her home and needed her pay stub to reflect her current status as an employee. Mr. Bellows replied in an e-mail that he "had thought that [Benders] [was] being paid as an employee until recently" and promised to issue her a corrected check. He changed his mind, however, because Mrs. Bellows would not allow it. Four days later, Benders sent Mr. Bellows an e-mail telling him that she intended to file a formal complaint with the IRS, requesting that the agency make a determination of her employment status.[3]

Finally, on April 20, 2004, Mr. Bellows told Benders to leave the firm. According to B&B, Benders was asked to leave because a day earlier she had become hostile with Mrs. Bellows. Mrs. Bellows subsequently told her husband that she would not come to the office until Benders was fired. B&B claims that Mr. Bellows told Benders she was "causing too much of a distraction."

---

[3] Benders ultimately did file a complaint with the IRS in July 2004.

Benders denies ever having an altercation with
Mrs. Bellows and maintains she was accused of "causing
too many problems" at the firm. Benders filed a retalia-
tory discharge claim with the EEOC and subsequently
received a right-to-sue letter.

In November 2004, Benders filed this suit in dis-
trict court, alleging three counts: (1) a claim of retalia-
tion for filing an EEOC charge under Title VII of the
Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; (2)
a claim of interference with the attainment of a benefit
under § 510 of the Employee Retirement Income Security
Act (ERISA), 29 U.S.C. § 1140 *et seq.*; and (3) a claim of
retaliatory discharge under Illinois common law. B&B
eventually moved for summary judgment and, as we
noted, the district court granted the motion.

We review a grant of summary judgment *de novo*. *Perez
v. Illinois*, 488 F.3d 773, 776 (7th Cir. 2007). Summary
judgment is proper if "the pleadings, the discovery and
disclosure materials on file, and any affidavits show that
there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(c). We draw all reasonable infer-
ences from the evidence in the light most favorable to
the nonmoving party. *Perez*, 488 F.3d at 776.

We first examine whether the district court correctly
found as a matter of law that B&B decided to fire Benders
in May 2003. As we stated earlier, this determination
was central to the court's decision to dismiss all three
claims.

The district court held that no reasonable trier of fact
could find other than that B&B decided to terminate
Benders' employment in 2003 primarily based on the
following "undisputed" facts: (1) in May 2003, Mr. Bellows
told Benders that her employment was being "terminated"
and that she should begin looking for another job;

(2) Benders' replacement, LeGrand, was hired shortly thereafter; and (3) Benders stated that her job had been "eliminated" in a January 2004 EEOC questionnaire. We disagree with this conclusion.

First, Benders did not concede that her employment was "terminated" in May 2003. The record shows that she admitted to the language Mr. Bellows used, but not to the fact that her employment had actually been terminated. Her response to a proposed finding of fact is illustrative: "Contested that the Firm *decided* to 'terminate' Benders in 2003. Benders was only *told* that she should begin looking for another job, not that she was terminated." (Emphasis added.) On the contrary, Benders testified that, while she may have been demoted in 2003, she was actually fired on April 20, 2004, 2 months after she filed a claim with the EEOC and 2 days after threatening to report certain conduct to the IRS. Thus, the *fact* that Benders' employment was "terminated" in May 2003 was far from undisputed.

Second, Benders did not admit that she was "replaced" by LeGrand in June 2003. Benders agreed that LeGrand was hired by the firm in June 2003 and that she took over some of Benders' responsibilities. However, Benders also testified that she continued working at the firm until April 2004 doing many of her usual duties, and it was unclear what her role was. Benders' response to a proposed finding of fact is helpful: "Contested. Benders stated that [m]y role diminished. But it still became— it was still fuzzy because at times it would come back . . . [s]o it never really stopped." Again, the *fact* that Benders had been replaced in the summer of 2003 was disputed.

Third, Benders' statements in the EEOC questionnaire are more complex than B&B acknowledges. Benders admitted writing "Demotion; Job elimination" in the space asking for "issues." However, she also wrote,

"TOLD to look for employment." These statements are not inconsistent with her understanding that, while her role had diminished somewhat, and she may have been demoted, B&B did not decide to fire her until April 2004. The attempt here to justify summary judgment on "undisputed" facts is not convincing.

Academic tenure cases likewise do not support a resolution of this dispute on summary judgment. In cases such as *Delaware State College v. Ricks*, 449 U.S. 250 (1980), *Chardon v. Fernandez*, 454 U.S. 6 (1981), and *Lever v. Northwestern University*, 979 F.2d 552 (7th Cir. 1992), courts have concluded that "termination of employment . . . is a delayed, but inevitable, consequence of the denial of tenure." *Ricks*, 449 U.S. at 257-58. Although that line of cases primarily deals with limitations questions (which are not at issue here), it is tempting to apply their discussions to this case. After all, the facts of *Ricks* and its progeny concern an initial decision (to deny tenure), which was communicated to the employee and subsequently followed by a period of continued employment. There, the courts found that the earlier decision was the important one, noting that "[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." *Id.* at 257. Thus, B&B might argue that a similar sequence of events occurred here: it made an initial decision (to fire Benders), gave the employee notice, and finally terminated her employment at a later date. Accordingly, Benders' ultimate dismissal in 2004 was a "delayed, but inevitable, consequence" of B&B's 2003 decision, which is the relevant date of termination.

We think that the *Ricks* line of cases is distinguishable. First, in those cases, the decision to deny tenure was made after a designated number of years, by a specific committee, with the employee's knowledge, and usually according to procedures outlined in a faculty handbook.

*See*, *e.g.*, *Lever*, 979 F.2d at 554. Nothing even coming close to a formal process was alleged in this case. Second, in the academic tenure case, the tenure decision was communicated to the employee in no uncertain terms, usually in a letter. *See*, *e.g.*, *id.* at 553. Here, we have only a private conversation between Mr. Bellows and Benders (and, we repeat, the two allegedly had a 5-year intimate relationship), the content of which is vague and disputed. Finally, in the *Ricks* line of cases, the employee who was denied tenure was usually offered a subsequent one-year "terminal" contract, with explicit notice that employment would end upon its expiration. Benders, however, was given no contract or even an end date. She was finally told to leave on a seemingly random day, 11 months after her initial conversation with Mr. Bellows, and before she found another job. We do not mean to imply that every termination must include all of these ingredients, but the absence of any formal process or clear evidence of a decision to terminate makes the academic tenure cases inapposite to a case like ours on summary judgment.

We conclude that the record paints an indeterminate picture of the significance of the May 2003 conversation. Whether Benders was fired on that date is a material issue of fact to be decided by a jury. Thus, it was error to grant summary judgment on that basis. We now turn to an individual assessment of Benders' three claims.

Benders' first count alleges a claim of retaliation under Title VII for filing an EEOC charge. *See* 42 U.S.C. § 2000e-3(a). A plaintiff can establish a *prima facie* case of unlawful retaliation via the direct or the indirect method of proof. *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Benders elects the former. Thus, to survive summary judgment, she must present direct evidence that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment

action; and (3) there is a causal connection between the two. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004). Because direct evidence—which essentially requires an admission by the employer—is rare, we also consider circumstantial evidence from which the fact finder could infer intentional discrimination. *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005). Benders' obstacle on summary judgment is the third element, causation.

B&B argues that Benders cannot establish causation as a matter of law pursuant to *Clark County School District v. Breeden*, 532 U.S. 268 (2001). In that case, the Court held that "[e]mployers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitely determined, is no evidence whatever of causality." *Id.* at 272. There, the employer's evidence that it intended to transfer the employee prior to learning of the lawsuit was not at issue, and the employee was transferred within about a month of the decision. *Id.* In *Cichon v. Exelon Generation Co.*, we applied *Clark County* to a case where the evidence showed that the decision to discharge an employee was made a day before the employer learned of the lawsuit, and the employee was removed less than a month later. *Cichon*, 401 F.3d 803, 811 (7th Cir. 2005). However, because we already found that there is a genuine issue of material fact as to when B&B decided to fire Benders, reliance on *Clark County* and *Cichon*, at this point, is premature.

B&B nevertheless asserts that Benders brought forth no direct or circumstantial evidence of causation. We disagree. Benders testified that on April 15, 2004, just 3 days after B&B filed its response with the EEOC, Mr. Bellows approached her and referred to the "awful EEOC charge" that she filed 2 months earlier. Benders was fired 5 days after that, before she found other em-

ployment, raising an inference that she was fired in retaliation for filing the charge. *See Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) (discussing the significance of "suspicious timing"). Mr. Bellows denied ever speaking to Benders about the EEOC charge, but this only creates a factual dispute to be resolved at trial. Viewed in the light most favorable to Benders, the evidence raises an inference of a causal connection between her complaints of discrimination and her termination.

Because Benders presented evidence establishing a *prima facie* case of retaliation, her Title VII claim must be tried unless B&B presents unrebutted evidence that Benders would have been fired absent her allegations of discrimination. *Stone*, 281 F.3d at 644. Summary judgment is only appropriate if there is no material issue of fact as to whether B&B's explanation is pretext for retaliation. *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 559 (7th Cir. 2004). Benders can avoid summary judgment by pointing to specific facts that cast doubt upon B&B's explanation. *Culver*, 416 F.3d at 547.

B&B advances several noninvidious reasons for terminating Benders: she failed to perform certain duties; she was disruptive and insubordinate; and she got into a hostile altercation with Mrs. Bellows. B&B produced e-mails allegedly evidencing Benders' poor performance. Rather than demonstrating Benders' incompetence, however, the e-mails show a general environment of distrust and dysfunction at the firm, where many employees—including Benders herself—were confused about her role and responsibilities. B&B also offered affidavits from employees verifying Benders' purported insubordination. However, Benders' testimony disputes the credibility of these affidavits and maintains that it was Mr. Bellows who made her working conditions difficult after she filed the EEOC charge. Finally, B&B offered affidavits confirming the alleged confrontation between

Mrs. Bellows and Benders. Again, Benders testified that she recalled no such altercation. Whether this confrontation took place and whether Benders underperformed in her duties are factual questions bearing on the issue of pretext. Thus, summary judgment is inappropriate on Benders' first claim.

Benders' second count alleges a claim of interference with the attainment of a benefit under § 510 of ERISA. That section states:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . .

29 U.S.C. § 1140. Section 510 protects the employment relationship giving rise to an individual's pension rights. *McGath v. Auto-Body N. Shore, Inc.*, 7 F.3d 665, 669 (7th Cir. 1993). In addition to termination, § 510 also applies to situations where an employer reclassifies an employee as an independent contractor, *see*, *e.g.*, *Berger v. AXA Network LLC*, 459 F.3d 804, 806 (7th Cir. 2006), as long as the employer had "the specific intent to deprive an employee of his plan rights." *Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 796 (7th Cir. 2005).

Benders maintains that B&B violated § 510 in two ways: (1) by reclassifying her as an independent contractor in December 2003 and refusing to reinstate her as an employee to avoid making a contribution to her 401(k) account; and (2) by terminating her employment in April 2004 because of her disagreement with her status as an independent contractor and her attempts to regain her status as an employee. Contrary to the district court's conclusion, this issue does not directly

depend on when Benders was fired. As Mr. Bellows acknowledged in his affidavit, whatever B&B decided in May, Benders would have been a "qualifying employee"— and thus eligible for the December 2003 contribution—if not for her change in status. B&B cannot reasonably dispute this fact because it argues that Benders knowingly accepted payment of a default judgment *instead of* a contribution to her 401(k) account. For such a *quid pro quo* to have occurred, Benders must have been entitled to the benefit to begin with. The issue boils down to whether Benders consented to the arrangement, thus negating the "specific intent" necessary to find B&B liable.

B&B first argues that there is no direct or circumstantial evidence that it intended to deprive Benders of a benefit. Again, B&B's argument is that Benders agreed to forego the 401(k) contribution in exchange for payment of her student loan judgment. However, Benders refuted this argument by testifying that she only agreed to remain an independent contractor for a few weeks, not indefinitely. As evidence, Benders produced e-mails in which she accused Mr. Bellows of reneging on his promise, to which Mr. Bellows responded that he would reinstate her as an employee. Indeed, in his affidavit, Mr. Bellows admitted to twice agreeing to restore Benders' status but later changing his mind. Furthermore, Benders ultimately was told to leave the firm 2 days after informing Mr. Bellows of her intent to file a claim with the IRS regarding her status. Thus, Benders offered some evidence that B&B intended to interfere with her attainment of a benefit when, despite her complaints, Mr. Bellows broke his promise and dismissed her.

B&B also maintains that it did not have the requisite intent to violate § 510 because it had no economic incentive to take the allegedly adverse action. *See Little v. Cox's Supermarkets*, 71 F.3d 637, 644 (7th Cir. 1995) (finding that a potential saving of $216 could not be viewed as a

motivating factor in the employee's discharge). We think there is no doubt that this contention is true. Paying off the student loan judgment greatly exceeded any contribution Benders would have received if she had remained an employee. Consequently, there is no material issue of fact regarding whether B&B intended to profit from keeping Benders classified as an independent contractor for part of 2003. Also, since Benders was fired, at the latest in April 2004, a 401(k) contribution for that year would not have been made. In that regard, it appears to be undisputed that none of B&B's employees received a 401(k) contribution in 2004.

Finally, given the reality of the sticky situation at B&B—where amour was hot and heavy in the air—it's more than a bit unrealistic to think that the firm shoved Benders out the door so it could save a few bucks by dodging a 401(k) contribution to a pension plan. Summary judgment was properly granted to B&B on Benders' ERISA claim.

Benders' third and final count alleges a claim of retaliatory discharge under Illinois common law in connection with her threat to notify the IRS of her employment status situation. As an exception to the at-will employment rule, a retaliatory discharge claim may succeed if an employee shows: (1) that she was discharged (2) in retaliation for her activities (3) in contravention of a clearly mandated public policy. *McGrath v. CCC Info. Servs., Inc.*, 731 N.E.2d 384, 388 (Ill. App. Ct. 2000). Illinois courts have held that the "clear mandate of public policy" standard is met in the context of workers' compensation claims and whistleblowing. *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936, 941 (7th Cir. 2002). When whistleblowing, the employee need not be correct about the unlawfulness of the conduct, as long as she held a good-faith belief. *Id.* The public policy requirement is not met when "only private interests are

at stake." *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 879 (Ill. 1981). The issue here is whether Benders' claim fails for this reason.[4]

B&B argues that the Illinois appellate court's decision in *McGrath* supports its position that Benders' dispute with the firm was purely private. There, the court rejected the employee's claim that violations of the state's Wage Payment and Collection Act formed the predicate for a retaliatory discharge suit. *McGrath*, 731 N.E.2d at 391. The court explained that a dispute over the employee's conditional stock options and calculation of bonus is economic in nature and therefore not actionable. However, in that case, the state statute only concerned the forfeiture of employee benefits. *Id.* at 390. Here, the federal laws governing the classification of workers as employees or independent contractors for tax purposes concern more than workers' economic interests. They affect the tax revenues collected by the federal government, the compliance with which, B&B does not dispute, is a matter of public concern. *See Brandon*, 277 F.3d at 942 (citing cases where violations of federal law have given rise to valid retaliatory discharge claims under Illinois law).

B&B also maintains that because Benders did not suspect tax fraud *per se* at the time she threatened to report the matter to the IRS, her claim is barred. We disagree. Illinois courts frame the inquiry as whether only private interests are "at stake," focusing on the employer's allegedly wrongful conduct. *See, e.g.*, *Palmateer*, 421 N.E.2d at 879. B&B cites no cases requiring the

---

[4] B&B also argued that Benders did not demonstrate that the firm's proffered reasons for firing her were pretext. However, as we discussed in the context of her Title VII claim, Benders adequately rebutted B&B's evidence on this issue.

employee to fully grasp the legal issues implicated by the employer's wrongdoing. Instead, Illinois case law holds that a "purely personal and private dispute" is not actionable. *McGrath*, 731 N.E.2d at 392. Benders' e-mail informing B&B of her intent to contact the IRS put the firm on notice of potential tax violations. Mr. Bellows acknowledged that he understood at the time that B&B might incur tax liability, if Benders' classification was incorrect. While Benders clearly had an economic interest in reporting the matter, the evidence shows that she also held a good-faith belief that what B&B was doing was not lawful. That, coupled with the fact that there was arguably some "public interest" implicated by B&B's conduct, is enough to overcome summary judgment.

Now that we have concluded that the district court erred in awarding summary judgment on two of the three counts in Benders' initial suit (*Benders I*), we turn to her second case, filed *pro se* (*Benders II*), where she alleges sex discrimination in violation of Title VII. Benders first tried to advance this claim in 2005, when she moved to file a third amended complaint to her original action. The district court denied that motion as untimely. Benders then filed a new complaint, raising the same sex discrimination claim, which the district court dismissed for failure to state a claim.[5]

Our review is *de novo*. *DeWalt v. Carter*, 224 F.3d 607, 611 (7th Cir. 2000). We take Benders' factual allegations

---

[5] Of course, the claim in *Benders II* was also dismissable as violative of the rule against splitting causes of actions—all of Benders' claims against B&B growing out of her employment there should have been in a single suit. That point was not pressed by B&B in the district court, so we won't consider it here. That's no-harm, no-foul for B&B here because, as we will conclude, the claim in *Benders II* will not be coming back alive.

as true and draw all reasonable inferences in her favor. *Id.* Although a *pro se* complaint is to be liberally construed, *Talley v. Lane*, 13 F.3d 1031, 1033 (7th Cir. 1994), a plaintiff can plead herself out of court by alleging facts that show she is not entitled to a judgment. *Early v. Bankers Life and Casualty Co.*, 959 F.2d 75, 79 (7th Cir. 1992).

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's . . . sex[.]" 42 U.S.C. § 2000e-2(a)(1). Benders' complaint alleges that she was fired because Mr. Bellows did not want his wife to learn about their affair. Essentially, Benders complains of being discriminated against not because of her sex, but because of her consensual sexual relationship with Mr. Bellows.[6] We agree that these allegations are insufficient to support a cause of action for sex discrimination. *See Kahn v. Objective Solutions, Int'l*, 86 F. Supp. 2d 377, 380 (S.D.N.Y. 2000) (collecting cases finding that a voluntary, romantic relationship cannot form the basis of a sex discrimination suit under Title VII); *see also Huebschen v. Dep't of Health and Soc. Servs.*, 716 F.2d 1167, 1172 (7th Cir. 1983) (reaching a similar conclusion in an analogous § 1983 equal protection case[7]).

Nor are the alleged facts sufficient to state a claim of sexual harassment based on a hostile work environment. A plaintiff claiming a hostile work environment must establish the following elements: (1) she was subject to unwelcome sexual harassment; (2) the harassment was

---

[6] Benders now argues that the sex was not consensual, but this statement is inconsistent with her complaint.

[7] The same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection claims. *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003).

based on sex; (3) the harassment had the effect of unreasonably interfering with her work performance in creating an intimidating, hostile, or offensive working environment that seriously affected her psychological well-being; and (4) there is a basis for employer liability. *Robinson v. Sappington*, 351 F.3d 317, 328-29 (7th Cir. 2003).

In her complaint, Benders does not allege that Mr. Bellows' initial sexual advances toward her had a negative effect on her work performance. Rather, she admits that she performed well, was promoted, and received pay raises during their 5-year affair. Benders also concedes that the break-up was "amicable" and that thereafter she and Mr. Bellows became "friends." Her accusations concerning a hostile work environment consist of conclusory statements pertaining to nonsexual conduct by Mr. Bellows a year later, after he told her to find another job. Benders alleges that Mr. Bellows' motivation behind getting her to leave was to hide their romantic relationship from his wife. Thus, we see again that Benders' complaint centers not around her sex, but her consensual sexual relationship with Mr. Bellows. This, as we discussed, is an insufficient basis for a Title VII claim.

For these reasons, we AFFIRM the grant of summary judgment to B&B on the ERISA count in case 06-1487 but REVERSE the grant of summary judgment on the other two claims in that case and REMAND for further proceedings consistent with this opinion. Finally, because we agree that Benders' second complaint fails to state a claim, we AFFIRM the judgment of dismissal in *Benders II*, case 06-2716.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*